## No. 11,642.

### J. E. HEWITT vs. T. J. WILLIAMS.

### MRS. F. P. WILLIAMS, INTERVENOR.

It is no ground for the dismissal of the suit that the plaintiff fails to annex documents to the petition. The defendant has the right to demand an exhibit of the documents, and on the failure of plaintiff to produce them he will not be required to answer the demand of plaintiff, and the dismissal of the suit will be the penalty for plaintiff's failure to produce.

The pledgee of a note can authorize the owner of the note to bring suit on it.

A suit upon notes not due should be dismissed as of non-suit. No sequestration can issue upon an unmatured obligation, except in the case provided for in Art. 275 C. P.

An act of a party which violates his contract for the furnishing of supplies will support an affidavit for writ of sequestration under Par. 8 of Art. 275, C. P.

It is not required that the plaintiff shall detail in the affidavit the facts upon which his fear is based.

A party who advances money for necessary supplies to be purchased for a plantation is not required to follow the destination of the money. But if before the money is advanced, under an agreement with the party to whom the money is loaned, a premium on a life policy is to be paid, the lender stands in the same position as one who directly furnishes the supplies, who can not claim a privilege on the crops for articles that are not necessary for their production.

The law applicable to the revocatory action can not be invoked to set aside a *dation en paiement*, made by the husband to the wife, to replace her paraphernal effects. The law favors restitution to the wife, and looks with favor upon the efforts of the husband to secure the just and honest claims of the wife against him.

The facts essential to the validity of the *dation* are the just and honest claims of the wife against her husband; the just proportion of the value of the thing given and the wife's debt, and the delivery to the wife of the thing given.

Since the adoption of the Constitution of 1879, and in the absence of legislation requiring the recordation of privileges on movable property, the privilege exists as against the world, and in a *dation en paiement* the wife takes the property subject to the privilege existing on it.

Hewitt vs. Williams.

ON APPLICATION FOR A REHEARING.

*Nicholls, C. J., Breaux, J., concurring*—The circumstances connected with the *dation* set up are not such as to call for decision on the question of privilege as effected by sale of the property.

*Watkins, Miller, JJ., dissenting.*

APPEAL from the Ninth Judicial District Court, Parish of De Soto. *Hall, J.*

*Goss & Parsons* and *Lee & Liverman* for Plaintiff and Appellant.

*J. F. Pierson* and *C. W. Elam* for Intervenor; Appellee, on application for a rehearing.

Movables have no sequel by a mortgage. When the movable is neither in the custody of the creditor nor of the debtor, nor of any other in his name, the creditor then has no longer any right to it. Domat, Civil Law, Part I, Book III, Tit. I, Secs. 1654, 1656; Troplong on Privileges and Hypothecations, Vol. 2, Secs. 394 and 395, p. 15; Comments on Art. 2118, C. N.

A privilege on a movable—though it affects that movable—gives no right of pursuit against it, for that effect can have no existence but that which is compatible with the nature of the movable. Troplong, *Ib.*, Vol. 1, p. 141, Sec. 103.

"Movables have no sequel by a mortgage," for three reasons:

1. Having no permanent or stable character like immovables they can not support hypothecation.
2. They may be easily placed in the hands of the creditors; hence, the r hypothecation without delivery is not necessary.
3. Their hypothecation would incommode—almost abolish—commerce. Troplong, *Ib.*, Sec. 395, Vol. 2; C. N. 2118.

These principles are embodied in our Civil Code and Code of Practice.

The same division of things into movables and immovables exists. C. C. 461.

The same distinction between immovables and movables is preserved. C. C., Book II, Tit. I, Chap. I, Secs. 2 and 3.

The same principles and distinction in relation to the power to hypothecate—the right to pursue the property into the hands of third persons—is maintained in our Code, and carefully confined

to those creditors who have either "a privilege or a mortgage on immovables." C. C. 3399.

A mere privilege (especially as to movables) is limited and restricted to a mere right of preference between creditors. C. C. 3186. But no right of pursuit or hypothecary right is recognized, except on "immovables," under C. C. 3399.

A movable may become immovable by destination (C. C. 468), and as such may become subject to a mortgage upon the realty to which it is attached. C. C. 3289.

It will be liberated from such mortgage by a valid sale and delivery thereof to a *bona fide* purchaser. Weill vs. Lapeyre, 38 An. 305; 42 An. 463.

In such case the creditor can not pursue such things in the hands of a third party purchaser and possessor, so as to subject them to his mortgage. *Ibid.* See authorities cited, pp. 305 and 306 of the opinion; 42 An. 463.

In the States where the chattel mortgage system prevails, and the right to pursue movables into the possession of third persons is recognized by the common law, appropriate proceedings and mode of procedure are specially provided by law to enforce such rights.

As such right is denied by the civil law in force in this State, consequently no appropriate remedy is provided therefor in the mode of procedure. The hypothecary action as to third persons is restricted to immovables. C. C. 3398; C. P. 61, 68, 734.

Hence, no right is given to follow movables into the hands of third persons, and no remedy is provided for the enforcement of such a right, which can have no recognition or enforcement under our law.

———

Argued and submitted November 16, 1894.

Opinion read December 10, 1894.

Opinion on application for rehearing handed down April 8, 1895.

———

The opinion of the court was delivered by

McENERY, J. The plaintiff instituted suit against defendant for the sum of eight thousand six hundred and fifty-three dollars and forty-one cents, with interest, for money advanced, goods and

merchandise supplied, all necessary advances furnished defendant to raise the usual crops on his plantation in Red River parish, for the year 1893. This sum is made up of a note for one thousand nine hundred and fifty dollars dated July 5, 1892, due December 5, 1892; a note for five hundred and twenty dollars dated September 7, 1892, due January 7, 1893, both payable to the order of the Traders' Bank, of Mansfield, and endorsed in blank by the bank; a note for one thousand and fifty dollars dated April 11, 1893, due January 1, 1894, to the order of defendant, and by him endorsed; a note for three thousand seven hundred dollars dated May 29, 1893, due December 15, 1893, to defendant's order and by him endorsed, and an account for one thousand nine hundred and forty-five dollars and sixty-nine cents for the year 1893, and a balance on an account of two hundred and thirty-seven dollars for necessary supplies furnished defendant for the year 1893, by the Hicks Company Limited, of Shreveport, and for which the plaintiff was responsible.

A writ of sequestration, issued on the usual affidavit, accompanied the demand of plaintiffs under which the crops of 1893 were sequestered.

The defendant filed exceptions to the suit as follows:

1. That plaintiff did not annex any of the notes sued upon to his petition, or give sufficient description of them to inform defendant or put him on his defence.

2. That the two notes of April 11, 1893, for one thousand and fifty dollars, and May 29, for three thousand seven hundred dollars, were not due or demandable at the date of the institution of this suit.

3. That plaintiff does not allege that he is the present holder of any of these notes.

4. That he was not the owner or holder of the notes sued on, nor was he in possession of them.

5. That neither of the accounts sued on are annexed to the petition, nor any of the items given, or other description of what they purport to be for, nor of the notes or character of said accounts or other specification, to enable defendant to plead or defend against them.

The first, third, fourth and fifth grounds of exception may be considered together.

It is no cause for the dismissal of the suit that the plaintiff fails to annex documents to the petition. An intelligent cause of action set

out in the petition is sufficient. The defendant, of course, has the right to demand an exhibit of the documents, and on the failure of the plaintiff to produce them, he will not be required to answer the demand made against him, and the dismissal of the suit will be the penalty of plaintiff's failure to produce. C. P. 175, amendment; Smith's Heirs vs. Blunt, 2 La. 132; Police Jury vs. Mahoudeau, 27 An. 224; Lamorere vs. Cox, 32 An. 1046.

In the case at bar the notes are accurately described in the petition, but are not made part of the same; and the statement of the account in the petition is based upon a bank account for money advanced to defendant, placed to his credit, and which he drew out on his own checks, or by checks for supplies, drawn by the Hicks Company, Limited, on the order of defendant. He must then have known of his exact standing with the bank, and he stands in the same position of one to whom a detailed statement has been made and accepted.

The petition declares that the plaintiff is the owner of the claim sued on. He asserts his privilege, asks for its recognition and a personal judgment for the amount sued for, and there is an allegation of ownership. Some of the notes were pledged by plaintiff when the suit was instituted. The defendant has no interest whatever in protecting the rights of the pledgees. His only concern is in protecting his own rights, and this can be done more effectually if he has defences against the notes where they are in the hands of the original holder. If the notes are produced on the trial and tendered to defendant, he certainly has no cause to complain, as his payment to the holder would be a valid extinguishment of the note. The general rule is that the pledgee is the *prima facie* owner of the pledged note, but this does not prevent him from authorizing the pledgor, the real owner of the note, from instituting suit on it.

The second ground of the exception is more serious, and in noticing it, we will consider here that part of the motion to dissolve the writ of sequestration which relates to the plaintiff's right to maintain the writ of sequestration on an unmatured obligation.

The two notes of April 11, 1893, for one thousand and fifty dollars, and of May 20, same year, for three thousand seven hundred dollars, were not due at the date of the institution of this suit.

There is no law which authorizes the institution of a suit on a debt not due, except in cases where conservatory writs are allowed to

protect the creditor who holds a privilege of a certain kind, such as the lessor's privilege (Art. 244, Code of Practice) ; and the holder of a special mortgage, who apprehends that the mortgaged property may be moved out of the State before he can have the benefit of his mortgage (Art. 275, Code of Practice) ; and in attachment proceedings, where the creditor makes oath that the debtor is about to move his property out of the State (Art. 248, Code of Practice).

There were no grounds to support the filing of the suit on these two notes, as they do not come within the exceptions to the general rule provided for in Arts. 244, 248, 275, Code of Practice. Egan vs. Fush, 46 An. 474.

The prayer of the petition is for an absolute judgment for the amount of these two notes. No supplemental petition was even filed alleging that they had matured since the filing of the suit.

The sequestration to protect the amount of these notes having unadvisedly issued, the judgment as to them should have been of nonsuit, without allowing the sequestration to remain in force as to them until a supplemental or amended petition could be filed.

The case referred to by plaintiff's counsel in 23 An. 578 has no application here, as the demand for rent in that case was based on one of the exceptions provided by the Code of Practice for the institution of a suit on a privilege claim before its maturity.

Defendant filed a motion to dissolve the attachment on the grounds: First, that the plaintiff does not establish by his allegations of affidavit that he'has a privilege on the property sequestered; second, that plaintiff's allegations and affidavit in relation to the account for one thousand nine hundred and forty-five dollars and sixty-nine cents are insufficient to authorize the writ; that he was liable as surety to Hicks & Co., Limited, for balance of account, two hundred and thirty-seven dollars and fifty-five cents and had not paid same; that the transfer of said account for one thousand nine hundred and sixty-five dollars and sixty-nine cents to the plaintiff by the cashier of the bank was contrary to public policy; that the affidavit is not true. That part of the motion, denying the ownership of the debt and its privilege character, was referred to the merits.

The plaintiff has sworn to the existence of the debt, and that he has a privilege on the property, and to the fear stated in Par. 8 of Art. 275, Code of Practice. This is sufficient, and brings this case

within the doctrine announced in Lowden vs. Robertson, 40 An. 825.

The law does not require the plaintiff to detail the facts upon which his fear is based. *Id.* We have already noticed the sufficiency of the allegations in the petition in reference to the account.

The defendant's answer is a general denial, with an affirmation of the special defences in his exception and motion.

The wife of defendant intervened in the suit, claiming the property sequestered as having been given to her in act *dation en paiement* on the 12th December, 1893, the day in which the writ of sequestration issued, and delivered to her before the seizure under the writ.

There was judgment below maintaining defendant's exception of prematurity to the suit on the notes not due when the suit was instituted; but leave was granted to plaintiff to bring another suit on these notes, and in the meantime the sequestration of the property was ordered to remain in force to await the filing of said suit to perfect the seizure. Judgment was rendered for plaintiff for the full amount of the other notes and on the account. The privilege of plaintiff was recognized and its enforcement ordered on the sequestered property for the amount of the note for one hundred and fifty dollars, and for nine hundred and sixty-nine dollars of the account. The privilege claimed for the two notes dated in 1892 was denied, and the balance of account of Hicks Company, Limited, for two hundred and thirty-seven dollars and seventy-five cents was rejected.

Plaintiff and defendant both appealed from the judgment.

### MERITS.

Plaintiff and defendant were the only witnesses sworn as to the contract entered into for money and necessary supplies for defendant's plantation in 1893. The former swore that he individually furnished the money and supplies, and that the Traders' Bank at Mansfield, of which he was the president, was employed only as a matter of convenience to both parties. The latter's statement is that he was under the impression, as he had no contract individually with plaintiff, that the bank was furnishing him, and that his dealings with plaintiff were with him as president of the bank. In this evident misunderstanding of defendant as to the party which

advanced the money and supplies, to get at the true state of facts, we will consider the course of dealing between plaintiff and defendant. It appears that all negotiations were with plaintiff, and we nowhere find the di ectors of the bank consulted in the matter. No official of the bank, nor is there any creditor of the bank, except defendant's wife, who asserts any right or title to the claim of the bank. Some of the directors were witnesses in this suit. Perhaps in the town of Mansfield, where this suit was instituted, all the shareholders, officials and creditors of the bank knew of the existence of this suit. Under the contract with defendant, Hicks Company, Limited, furnished him with supplies. These were furnished on the individual credit of plaintiff, and not on the recommendation of the bank. The contract for supplies was, in the absence of any testimony to the contrary, we believe, an entirety. There is no intimation that the plaintiff was to supply from Hicks Company, Limited, the supplies of meat, bread, etc., and the bank the money. There is no ground for believing that the bank was to furnish the money and the plaintiff the supplies through other parties. We are of the opinion that plaintiff agreed to furnish both money and supplies, and that the account of defendant was kept at the bank for the convenience of both parties, and that defendants' checks on the bank were protected by money specially deposited for this purpose by the plaintiff. It is true that the cashier of a bank is without authority to transfer, on the demand of the president, bank claims to him. In this case, however, the bank did not own the claims. Defendant's account had been paid by the plaintiff, in the case of defendant's dealing with the bank, by drawing checks on the same, which were virtually covered by plaintiff's money, or it would be more correct to say, by deposits previously made by plaintiff. The bank, therefore, had no interest in the defendant's account, and the transfer on the account to defendant is nothing more than a statement that the same had been paid by plaintiff, and is evidence of the fact, stated by plaintiff, that defendant's account was kept at the bank as a matter of convenience in his own name for the greater convenience of both parties, and that the checks drawn by defendant were against funds placed to his credit by the plaintiff. The whole case briefly stated is that the plaintiff agreed to furnish the defendant to a certain amount and deposited that amount in bank to his credit, against which the defendant drew as his necessities required.

Evidence was offered to show that certain items on the account were paid out for things that were not necessary supplies. If the defendant had purchased his supplies directly from the plaintiff, he would, in order to obtain a privilege, be bound to furnish only such supplies as are known as "necessary," such as are usually used in the cultivation and production of crops. But where money is advanced to purchase supplies, it would be unreasonable to require the party who advances the money to inquire into the details of its disbursement. In fact, if he places the money in bank to the credit of the borrower, he can not control its use. He can not, therefore, be held to a knowledge of the ultimate destination, and be required to direct its specific use. Lehman, Abraham & Co. vs. Godbery, 40 An. 219.

But in this account there are two items of checks drawn to pay premium policies on the life insurance of defendant. These payments were made in 1893, under a prior agreement entered into with defendant. Plaintiff's explanation that the agreement was to pay the premiums out of amounts deposited by Sentell & Co. and some other small deposits, to credit of defendant, is unsatisfactory. These deposits were made in 1892, and on May 30, 1893, defendant owed the bank, or plaintiff, forty-five dollars. The premiums were paid on September 23, 1893, and June 27, 1893. It is certain that, with the consent of both parties, these premiums were paid out of the fund advanced to make the crop of 1893. No privilege exists for the amounts so paid.

The notes for one thousand and fifty dollars, dated July 5, 1892, and for five hundred and twenty dollars, dated September 7, 1892, are not privilege debts. They were not executed for any advance made to the defendant in 1893.

The evidence shows that the plaintiff was surety for the defendant with the Hicks Company, Limited. Some of the supplies furnished were paid for by plaintiff, and charged to defendant in the bank account. The balance, two hundred and thirty-seven dollars and seventy-five cents, the plaintiff has not yet paid. He has no claim against defendant for this sum until he shall have paid the same.

Just prior to the issuing of the writ of sequestration the defendant had entered into engagement with John T. Hardie & Co., of New Orleans, to ship his crop of cotton of 1893 to them. His agreement with plaintiff was to let him have his cotton to be shipped to the

Hicks Company, Limited. In anticipation of the shipment of the cotton to Hardie & Co. he had drawn two drafts on them. The agreement with Hardie & Co. is not denied. It was a plain violation of his contract with plaintiff, and was sufficient to excite his fear, and justify the issuing of the writ of sequestration, the safest and speediest remedy which he could invoke to protect his rights.

### INTERVENTION OF MRS. WILLIAMS.

There seems to be no contention as to the amount due by the husband to the wife. Nor is there any contention as to the just value of the property given to the wife to the amount due her by the husband.

The rules governing the revocatory action do not apply to the *dation en paiement* by the husband to the wife in satisfaction of her just claim. The facts essential to the validity of the *dation* are the just and honest claim of the wife against the husband; the just proportion of the value of the thing given and the wife's claim, and the delivery to the wife of the thing given to her in satisfaction of her debt againt the husband.

The law favors restitution to the wife and looks with favor upon the efforts of the husband to secure her just and honest claim against him. The fact that he is insolvent and embarrassed; that he is pursued by his creditors by harsh remedies can not be invoked to destroy the validity of the transaction. The wife, like any other creditor, is sustained in her vigilant efforts to secure her debts, and the husband can be excused if, finding himself in financial straits, affection for his wife and his duty to her and to their children impels him to secure her just claim, and to aid and assist her in all proper methods in that direction.

The contention here is that there was no delivery of the crops to the wife. The property was as speedily and actually delivered as property of that kind can be. It was placed in the hands of a third party, who gave a receipt for the same.

The District Judge reviews the evidence on the fact of delivery, and we think we commit no error in concurring in his findings on this point.

Prior to the adoption of the Constitution of 1879, when to preserve the privilege as a furnisher of supplies it was necessary to record it, the sale of the crop before the recordation of his privilege

either defeated it or postponed it to those acquired since.    But by Art. 177 of the Constitution of 1879, "privileges on movable prop-erty shall exist without registration, except in such cases as the General Assembly may prescribe by law after the adoption of this Constitution."

The Legislature has not enacted any law requiring the recordation of privileges on movable property.    The privilege is, therefore, without recordation, preserved to all the world.    Flower & King vs. Skipwith, 45 An. 895.

The intervenor acquired the property subject to the lien and privi-lege of plaintiff.    Id.

The judgment in favor of plaintiff will, therefore, be amended so as to avoid that part of it which maintains the sequestration on the unmatured notes at the filing of the suit, until suit should be filed to perfect the sequestration and to avoid that part of the judgment, also, which exempts from the enforcement of plaintiff's privilege the crops sold to the intervenor in the *dation en paiement*.    In other respects the judgment is affirmed.

The judgment in favor of the intervenor is amended so as to order the delivery of the property described in the *dation en paiement* to her only after the satisfaction of plaintiff's privilege as recognized in the judgment in her favor.    In other respects the judgment in favor of intervenor is affirmed.

It is therefore ordered that the judgment in favor of plaintiff and the judgment in favor of intervenor be amended in accordance with the views herein stated, and otherwise affirmed, defendant and the intervenors to pay costs of appeal.

## ON APPLICATION FOR A REHEARING.

NICHOLLS, C. J.    I do not think the circumstances connected with the *dation en paiement* set up in this case are such as to call for any decision upon the general question whether the privilege of the furnisher of supplies is cut off by a sale of the property struck by the privilege.

Rehearing refused.

BREAUX, J., concurs.

DISSENTING OPINION ON APPLICATION FOR REHEARING.

WATKINS, J.   The application for relief is by the intervenor alone. She puts her claim to relief on the ground that plaintiff's privilege as the furnisher of necessary plantation supplies can not be enforced against crops produced on the defendant's plantation after sale and delivery thereof to her—the averment of her petition being that his seizure of same under a writ of sequestration is *illegal and void.*

That plaintiff had a privilege on the crops of the defendant, which was enforceable against them so long as they continued to be his property, there is no doubt.   R. C. C. 32,171.

That they had been sold and delivered to the intervenor *prior* to plaintiff's seizure is a fact that is recognized by our opinion, and plaintiff has not complained; and it is now final and irrevocable in this · respect.

Hence the legal principle that plaintiff asks this court to affirm is, that the privilege for plantation supplies may be judicially enforced against crops stricken thereby, after *bona fide* sale and actual delivery thereof to the purchaser.

In my judgment this can not be done for the reason that the law does not so provide.

Privilege is a right which springs from the nature of the debt (R. C. C. 3186) ; but there are quite a variety of different kinds of privileges which are governed by different precepts of law.

Let me take for an illustration the lessor's privilege, which, under the law (Act 89 of 1886), enjoys a preference over all other privileges, and see what are the provisions of law governing same and how they have been construed in respect to the sale of objects affected thereby.

On examination we find that the Code in terms declares that the lessor's privilege is lost by reason of a conventional sale of the thing which is subject to it.   Thus:

" In the exercise of this right the lessor may seize the objects which are subject to it before the lessor takes them away, or within fifteen days after they are taken away, *if they continue to be the property of the lessee* and can be identified."  R. C. C. 2709; C. P. 288.

The right to provisionally seize property affected by a lessor's privilege, in the hands of third persons, has ever been regarded as exceptionally favorable to lessors—it being a benefit not enjoyed by

48

any other class of privileged creditors. But it must not escape attention that even this highly favored privilege can not be enforced after the property affected by it has been sold and delivered to a third person, for the law is that the lessor may seize it within fifteen days after it has been taken off the leased premises *only* on the condition that it " *continue to be the property of the lessee.*"

Then let us suppose that the lessee had disposed of the property which is subject to the lessor's privilege, what is his recourse?

A provisional seizure in disregard of the third possessor's rights? Not at all.

We find an answer to the question in the case of Dennistoun vs. Fiste, 2 An. 14, where a lessor gave his stock of goods in payment of the claim of a creditor holding a vendor's lien; which giving in payment was annulled at the suit of the lessor, on a charge of collusion and fraud between the creditor and his vendor to deprive him of his lien and privilege.

· The court held that the transaction was " a fraudulent preference by an insolvent debtor; and a breach of good faith toward the landlord, and a violation of his rights in the removal of the goods."

The sale was annulled, and the goods were brought back under the subjection of the lessor's privilege again.

What is striking in that case is that suit had to be brought for the revocation of the sale, to which both the recalcitrant tenant and his fraudulent vendee were necessary parties, in order to bring the property back under the dominion of the lessor's privilege again.

The provisions of the Code with respect to the privilege for necessary supplies are that " debts due for necessary supplies furnished to any farm or plantation " bear a privilege upon the crops " of the year and the proceeds thereof;" and they further specially provide that such privilege " shall not be divested by any prior mortgage, whether conventional, legal or judicial, or by any seizure and sale of the land while the crop is on it." R. C. C. 3217, Pars. 1 and 9.

If a sale of the crop did not divest the property of pre-existing privilege, that provision would be meaningless altogether.

· And there is no distinction in principle between a judicial and conventional sale.

Sequestration is the writ provided by law for the enforcement of the supply lien. C. P. 275. If it were the intention of the law-maker that it could be exercised against crops after their

sale and actual delivery to a third person, why is it that nothing is said in the Code with regard *to the notice* to be given to such purchaser *prior to seizure?*

It provides that the creditor must, as a condition precedent to the granting of an order for the issuance of the writ, execute bond "in favor of the defendant," with good security, "to be responsible for such damages as the defendant may sustain, in case the sequestration should have been wrongfully obtained." C. P. 276.

It further provides that "a defendant against whom a mandate of sequestration has been obtained * * * may have same set aside" on furnishing bond and security (C. P. 279, 280), but there is no provision of the Code requiring any citation or notice to a third person or purchaser of movable property thus affected.

The seizing creditor is not primarily required to give bond in his favor.

These provisions of the Code necessarily lead to one of two conclusions, (1) that the privilege of the supply creditor can not be enforced against crops after they have been sold and delivered to a third person, or (2) that a third person buying crops affected thereby may be proceeded against, without bond, citation or notice of any kind, and without affording him any protection whatever—notwithstanding the fact that notice, bond and security are accorded the fraudulent debtor who has thus disposed of his property to the prejudice of his creditors.

The instant case is an illustration of the harshness of such a rule; for the plaintiff sent his writ into an adjoining parish and caused property of the intervenor to be sequestered by the sheriff and *taken out of her possession* in plain disregard of her authentic title, and *without any citation and notice of seizure.*

There is no case in which such proceeding is warranted, except that of executory process in the foreclosure of a duly recorded conventional mortgage, containing the non-alienation clause.

Plaintiff's privilege was not recorded, and there is no law requiring the registry of privileges on movable property.

We have been cited to the case of Bres & O'Brien vs. Cowan 22 An. 438, as sustaining the right of sequestration of a crop out of the possession of a third person.   That is the case of a supply creditor's sequestration of crops being met by the demand of an intervenor, claiming ownership in virtue of a surrender of same to him as the assignee of the claims of laborers for wages due.

The court in speaking of this transaction say:

"We doubt if the rights of the plaintiff could be thus extinguished; but we are not satisfied that there was any claim by (the intervenor) on the defendant;'' and held, that in the absence of proof to that effect " he appears in the case as a party interposed to rescue nine bales of cotton, for the benefit of defendant, from the just grasp of the plaintiff's privilege.''

It is evident that the opinion in that case proceeded on the theory that the sale was a fraudulent simulation; and having found that to be a fact, nothing further could be decided.

The case of Cory vs. Eddins, 13 An. 443, is also cited by the plaintiff's counsel. In that case the court say:

"Both parties were aware of each others' privileges upon the cotton raised by the common debtor, Tiffee, which was *shipped* by the defendant, and there was no such *bona fide* sale of that lot, to either of them, as to defeat the privilege of either. The net proceeds of this cotton *in defendant's* hands  *  *  *  must, therefore, be treated as subject to the privileges of both.''

It is quite evident that that opinion does not support the plaintiff's contention. Quite the contrary; because it states " a negative pregnant with an affirmative.'' That is to say, if, as the court declares, " there was no such *bona fide* sale  *  * as to defeat the privilege;'' do they not at the same time affirm that the privilege would have been defeated if there had been a *bona fide* sale.

But plaintiff's counsel in his brief, in reply to intervenor's application for rehearing, calls attention to the fact that she acquired the property of the defendant by a *dation en paiement;* and charges that same was illegal and with full notice of his privilege.

It is true that the plaintiff, in his answer to the intervention, charges that the *dation* was unsupported by evidence, gave an unjust preference to intervenor over other creditors of her husband, and, if maintained, will result to their prejudice—he being insolvent.

He further charges that it was unaccompanied by an actual delivery.

But all these charges were met and answered at the trial; and her *dation* was affirmed by our decree, and the plaintiff has not made any complaint of our judgment.

Amongst other things the evidence shows that the *dation* was

completed by an actual delivery of the property—delivery being *the* essential thing in effectuating a giving in payment.    R. C. C. 2656.

There is nothing in the facts to destroy the validity or the *bona fides* of the intervenor's title.

Let us now examine other provisions of the Civil Code, treating of similar privileges, for the purpose of ascertaining by analogy what effect is to be given to the provisions which are applicable to the privilege for supplies.

For instance, Article 3223 provides:

"If the depositary abuses his trust by alienating the thing confided to his care, or if the heirs sell it, not knowing that it had been given in deposit, the depositor retains his privilege *on the price* which shall be due."    R. C. C 3223.

That article affirms the validity of the *title* of the purchaser and only recognizes the depositor's lien upon the unpaid price of the thing sold.

Article 3227 declares that the vendor of movable effects has a privilege on the thing sold " if the property still remains in the possession of the purchaser."    R. C. C. 3227.

That article contains the special provision that " any person who may sell agricultural products of the United States shall be entitled to a special lien and privilege thereon, to secure the payment of the purchase money, for and during the space of five days only, after the day of delivery; within which time the vendor shall be entitled to seize the same, in whatsoever hands or place they may be found," etc.

Article 3239 provides:

" Creditors having privileges on ships or other vessels may pursue the vessel in the possession of any person who has obtained it by virtue of a sale," etc.    R. C. C. 3239.

Article 3242 provides:

" Where a sale has been made, the vessel being in port, the creditors of the vendor, who enjoy the privilege for some cause anterior to the act of sale, may demand payment and enforce their rights over the ship until a voyage has been made in the name and at the risk of the purchaser, without any claim interposed by them."    R. C. C. 3242.

Article 3246 provides that—

"The captain has a privilege for the freight during fifteen days

after the delivery of the merchandise, if they have not passed into third hands." R. C. C. 3246.

Article 3247 provides:

"Every consignee, or commission merchant or factor, shall have a privilege preferred to any attaching creditor on the goods consigned to him  *   *   *   *provided* the privilege established by this article shall not have preference over a privilege pre-existing on the goods aforesaid in behalf of resident creditors of this State." R. C. C. 3247.

Considering these various different precepts of the Code establishing and particularly defining various privileges on different movables, without providing that either can be enforced after sale of the thing affected by it, it seems difficult to understand why the supply privilege should be paramount to them all without any precept of law to justify it.

The plaintiff's reliance in argument—and that of the opinion of the court—seems to be upon our opinion in Flower & King vs. Skipwith, 45 An. 855, as sustaining plaintiff's seizure of crops the intervenor had purchased. But that was not the case of a *sale* but of a pledge.

The court say:

"But to say that a privilege legally existent and valid as to all the world could be destroyed or impaired by a *subsequent pledge*, shocks all sense of justice, and would open the door for fraud, under which every merchant, after advancing to the near completion of the crop, might find his privilege destroyed by the recordation, at the last moment, of a pledge to some third person for future supplies."

The contest in that case was one of relative rank of privilege on the defendant's crop between the supply creditor and a pledgee under the Planters' Act of 1874.

No sale of the crop was involved at all. The defendant, Skipwith, was owner in possession of the crops. They were sequestered by plaintiffs on the defendant's plantation. The latter had not in any manner attempted to dispose of same.

It is therefore with perfect confidence affirmed that the Skipwith case does not decide the question we have under consideration.

But our attention has been attracted to the following cases as fully establishing the principle that is insisted upon by plaintiff, viz.: Welsh vs. Barrow, 3 An. 133; Succession of Johnson, 3 R. 216; Garcia vs. Garcia, 7 An. 525.

In the first case the question was in reference to the privilege of the overseer for his wages "on the *proceeds* of the crop of sugar received by the defendant, the owner of the plantation, from which the crop was sold"—the *standing crop* being on the plantation ungathered at time of its sale to the defendant.

In that case the defendant's contention was, that the privilege of the overseer was extinguished by the sale of the land with the crop ungathered on it (R. C. C. 3277, 3244); and of this contention the court say:

"By Article 3184 (R. C. C. 3217) the salary of the overseer for the last year is privileged *on the product of the last crop*, thus presupposing that the planter would not keep his crop, but sell it; and the privilege is affixed specially on the *proceeds*. Such is the construction given to it by this court in the cases cited," etc. Welch vs. Shields, 6 R. 484; Welch vs. Barrow, 9 R. 520.

" And in the Succession of Johnson, 3 R. 216, the court held that this privilege on last year's crop may be exercised upon the *proceeds after the crop has been sent to the market and sold.*

" If the *proceeds* were in a court of justice, or in the hands of the defendant's factor, the plaintiff would have his privileges over other creditors, and we do not understand on what principle he can be deprived of it when the *proceeds* are in the defendant's pockets."

It is worthy of notice that the defendant sold the crop after his purchase of the plantation and the growing crop, and had the *proceeds* in his possession.

That case was the supplement of those preceding cases.        .

In the *first* the plaintiff, overseer, brought suit against his employer, Shields, and his vendee, Barrow, while the crop in kind was in the latter's possession, causing same to be sequestered.

In the lower court there was judgment in Barrow's favor, but it was reversed in this court, the opinion holding " that the plaintiff did not lose his privilege by the transfer of the plantation to another person, (and) that the defendant, Barrow, purchased the crop *subject to the right previously acquired* by the plaintiff." Welch vs. Shields *et al.*, 6 R. 484.

At the date that decision was rendered there was no privilege in favor of the furnisher of supplies. It was for the first time granted by the Legislature in 1843. *Vide* Act 23 of March, 1843.

Since that decision was rendered the old Art. 3184 was so amended

by statute as to make it conform to the principle announced in that decision, to the effect that the privileges conferred by that article should " not be divested by any prior mortgage, whether conventional, legal or judicial, or by any seizure and sale of the land with the crop on it."

That amendment was carried into the revision of the Code of 1870. *Vide* R. C. C. 3217, par. 2 of No. 9.

The suit of Welch vs. Barrow was founded on the forthcoming bond defendant gave to obtain the release of the crops, which were sequestered in the previous suit; and this court, holding the same to have been premature for want of compliance with conditions precedent, reversed and remanded it.

The litigation terminated with Welch vs. Barrow, 3 An. 133, first cited *supra*.

The case of Johnson's Succession, 3 R. 216, presents a question of the rank of an overseer's claim for wages on the *proceeds* of crops which were in the hands of the legal representative of the deceased, and which were marshaled for distribution on his account.

The question in Garcia vs. Garcia, 7 An. 525, was of the rank of an overseer's privilege, as compared with that of a pledgee—the crop being *on the premises of the debtor*.

This last case presents the same question as that occurring in the Skipwith case *supra*.

It will be observed that in those cases the overseer's privilege was treated as one exceptionally strong, because it affected not only the *crops*, but their *proceeds after sale*. But in the revision of the Code all privileges were alike extended to " *the crops of the year and the proceeds thereof*." R. C. C. 3217, No. 1.

But taking this into the account, what is the result? It seems to be perfectly evident that as the privilege is made to extend to and affect alike the crops while in the debtor's possession, and " *the proceeds thereof*" *after sale*, that the thing subject to the privilege *passes into a purchaser's hand free from its grasp*. If such were not the case, how could the lien be transferred from the crop to " the proceeds thereof?"

Is this not the usual and universal result of judicial sales? If the sale did not have the effect of divesting the thing of its encumbrances and of transferring them " to the proceeds thereof," who would or could afford to buy at such a sale? No one.

The inference is quite clear that it was the purpose of the Legislature, in adopting this revisory legislation, to put a private sale of agricultural products upon the same plane as judicial sales, by transferring the privilege of the creditor "to the products thereof" after sale; and to liberate the product, so that it could pass in open market without any embarrassment.

In Phelps vs. Howell Jacobs, Intervenor, 35 An. 87, the *pledge* of defendant, under the planter's act of 1874, was held paramount to a sale of cotton in transit to the intervenor—the court holding "that under the statute the delivery of the bill of lading to the carrier for transmission to the consignee \* \* \* created a perfect *pledge* of the same in favor of the factor and consignee" and protected the cargo from sale.

To the same effect is Florsheim vs. Howell, 33 An. 1184.

The court further say:

"We are not concerned under the issue presented in this case "with the question of ownership of the cotton under the sale made by Howell to Jacobs. The purchaser of property, under such circumstances, must take it subject to the incumbrances existing on the same," etc.

The reason is plain, and it is because, on board of a vessel in transit, the cotton was not susceptible of the *actual delivery* which was necessary to make a sale of movables effectual.

That opinion does not present the case of a privilege of the supply creditor, as did the case of Flower & King vs. Shipwith, 45 An. 895, but the case of a pledge under Sec. 2 of Act 66 of 1874.

· The French law and jurisprudence is in accord with this principle. The civil law has ever maintained and sanctioned it in the interest of public convenience and of a free commerce.

Domat, in his Commentaries on the Civil Law, states the rule to be that the "pawn upon a movable thing lasts no longer than whilst the thing is in the custody of the person who is bound \* \* \* But if the debtor makes it to pass into other hands, either by alienating or pawning it, the creditor can not any longer lay claim to it." Sec. 1655.

"And when the movable thing is neither in the custody of the creditor, nor of the debtor, nor of any other in his name, the debtor having alienated it, the creditor has no longer any right to it." Sec. 1656.

Troplong, in treating of this question, says that a privilege on movables "gives no right of pursuit to the creditor against it." 2 Troplong's Com. on Priv. and Hyp., Sec. 394; 1 Troplong's Com. on Priv. and Hyp., Sec. 101.

But the correctness of this rule can not be better exhibited than by referring to the one applicable to *privileges* on immovables—the Code declaring that "the creditor who has a *privilege on immovables* may *pursue their claims on them into whatever hands they may happen to pass*, to be paid out of their proceeds *according to their rank*," etc. R. C. C. 3399.

This kind of privilege is required to be recorded; the relative rank of different privileges being fixed by the order in which same have been recorded. R. C. C. 3273, 3274.

Privileges on *movable* property take the rank which is established by statute (Act 89 of 1886), and they require no registry; and, therefrom, the further inference may be drawn that pursuit of the property, after sale, was not contemplated by the Legislature, the purchaser in good faith acquiring a title free from the grasp of the creditor's privilege.

Thus it appears, from all the comparative and analogous provisions of the codes, as well as from our jurisprudence, that privileges on movables are extinguished by private sale of the thing affected by them. If this were not so, there would be no safety in dealing in agricultural products of this State at home or abroad, because of there being no secure guaranty of title to the purchaser for cash paid in market overt. If a contrary principle be maintained, what merchant in the country or broker in the city of New Orleans could with safety deal in them?

For, if either should deal in them, he would run the risk of having the cotton, sugar or rice seized in his hands by some overseer or supply creditor, as the property of the intervenor was.

Nothing is of greater importance to a great city like New Orlean than the freedom of commerce, and any restraint upon trade strikes a blow at her prosperity.

It is a matter of general notoriety, as well as of public concern, that the masses of our people are in debt, and that the agriculturist can not possibly produce a crop without assistance and credit. And, to obtain credit, he must inspire confidence and possess the

means of securing repayment of the money or advances that have been made to him.

An interesting and instructive article on this subject recently appeared in the *Daily Picayune*, from which I take the liberty of making the following extract, viz.:

"In any system of business which is largely based on credit, one of the most necessary ingredients is confidence.

"No man can borrow money, or secure supplies on credit at a grocery, unless he can inspire the person from whom the credit is asked with the belief that the loan will be duly met, and that the supplies will be paid for at the time contracted.

"Credit, it will be seen, is the very foundation of business, and it is to-day impossible to carry on the business of the world without it. The wisdom of conducting one's private household expenses wholly for cash is a good thing to din into the ears cf people who live on salaries, and get their money at frequent and regular intervals; but, all the same, the great business of the world can not be done for cash. Credit is an element absolutely necessary to it.

"The reason for this will be plainly seen when it is considered that America is pre-eminently an agricultural country, and the greater part of its wealth begins with the plow. From six to nine months of work on the plantation is required to make the average staple crop, from the planting of the seed to the gathering of the harvest. Until the harvest is gathered, and the product is ready for market, the agriculturist can not, by any cash transaction, realize a dollar out of his long period of labor; but he must live, he must support his family and pay all the expenses of making a crop, without the hope of realizing a dollar until his stuff is placed on sale.

"Necessarily, the agriculturist must have credit and a liberal allowance of it, and he gets it, provided somebody who can help him with advances of money or supplies has a proper amount of confidence in his ability and willingness to pay.

"The man who is mining or manufacturing has something to sell as soon as he begins to turn out products; but the farmer has to wait until his crop shall be made in every part, from seed-planting to harvesting. All the vast products of wheat, corn, cotton, sugar, tobacco, rice and cther staples are made in this way and are dependent on credit.

"This being essentially a credit country, it will be seen what an

enormous business is based on confidence. This commercial and financial confidence is a fabric which pervades the entire business of the country, from that of the humblest individual up to that of the nation itself.''

That *credit* is the foundation of American thrift and enterprise, every one must admit. And *confidence* is the basis of credit. Upon this subject Mr. J. H. Eckels, comptroller of the currency, has contributed to *The Forum* for March an invaluable article, in which a similar lesson is taught, and from which I make the subjoined extract, viz.:

'' The present conditions of the business world ought not to exist. That they do exist is evidence that either in our methods of doing business, in ur extravagance of expenditure and in our speculation, in the Government's financial system, or in the tone which has characterized our monetary legislation proposed or enacted, there is something radically wrong and harmful. In the midst of great plenty the American people to-day feel poor. With no tariff agitation going on, and the manufacturer in possession of a complete knowledge of the basis upon which he must operate, industry languishes and the laborer in many places is without employment. In every financial institution there is an abundance of money or the representative of money seeking investments, and yet few investments are made or desired. Upon the one side credit is little sought, and upon the other reluctantly given. A stagnation long continued is yet upon us and will remain until our own people impart activity to trade, and other peoples who are dealing with and extending credit to us feel confidence that they can do so with perfect safety.''

It is of the greatest importance that the decisions of this court should protect *credit* and inspire confidence.

Entertaining this view of the law and public policy, I feel constrained to dissent from the views and opinions of the majority.

## DISSENTING OPINION.

MILLER, J. I am inclined to think the privilege for plantation supplies on the crops conferred by Art. 3217 of the Code does not follow the property on which it rests into the hands of a *bona fide* purchaser. The Code itself, in my view, suggests the limitation of the privilege as a general rule to the possession of the debtor. The

mortgage follows the property into whatever hand the property passes, is the declaration of the Code. No such expression occurs in connection with the privilege. In the theory of the Code, it rests on the debtor's property, and is the rule of distribution among his creditors, while the property, the subject of the privilege, continues to be his property. One of the commentators puts it: "Selon le droit commun, le privilége sur les meubles n' est efficace qu' autant que la chose sur laquelle il existe est saisie sur le débiteur; le créancier privilégié est alors payé, avant tous les autres, sur le prix en provenent. Mais, si le débiteur aliène la chose, le créancier ne peut pas la suivre entre les mains du tiers acquéreur: car les meubles n'ont par de suite par privilége." 3 Mourlon, 517; Civil Code, Arts. 3278, 3282, 3182, 3183. The theory finds additional support in the statutory enlargement of the privilege of the vendor of agricultural products. As the Code stood that privilege could be exerted on the price if the property still remained in the possession of the purchaser. Code of 1825, Art. 3194. It was by statute the privilege of the unpaid vendor of agricultural products sold in New Orleans was made to follow the property for five days into the hands of others holding from the original purchaser. Act 1852, p. 363; see Laughlin vs. Ganahl, 11 Rob. 140; Fetter vs. Field, 1 An. 80. See the construction of the factors' pledge law No. 66 of 1874; Florsheim Bros. vs. Howell, 33 An. 181; Phelps vs. Howell, 35 An. 87.

I can understand, too, that whenever the title of a purchaser from the debtor, who has not paid his vendor, is tainted with fraud, such purchaser can not hold against the unpaid vendor. That was one phase of the 1st Annual case. So again this court maintained the privilege of the lessor against the purchaser from the lessor, both combining in a fraudulent removal of the goods from the leased premises. Dennistoun vs. Malard, 2 An. 14. But without legislation manifesting the plain purpose to make the privilege against a debtor follow the property, my impression is a *bona fide* sale by the debtors, followed by delivery to the purchaser, defeats the privilege. To determine the scope of this privilege given by Art. 3217 for plantation supplies, as well as to ascertain, by fuller examination and discussion, the intervenor's title impugned by the plaintiff contesting the privilege, I think the rehearing should be granted. The questions are important and have been presented, as I appreciate the discussion, only on the application for the rehearing.