MONROE, J.
This is a proceeding under article 101 of the Constitution for the review of a judgment rendered by the Court of Appeal for the Third Circuit. The case presented by the record which has been sent up is as follows:
Statement.
For several years prior to 1902 the Tendal Co., Limited, composed of Calvin R. Mower, F. Brooke Adams, and presumably some other person or persons, being engaged in raising cotton on two plantations owned by Mower in the parish of Madison, bought the provisions and supplies required by it from the Southern Grocer Company, Limited, a concern engaged in the wholesale grocery and cotton factorage business at Monroe, in the parish of Ouachita. The plantations were managed by Adams, but whether the supplies were charged to him, or to the company of which he was a member, does not appear. In fact, it seems likely that they were bought for cash or on short time, and were, in the main, paid for without reference to the ma *63 turity and sale of the crops. However that may be, upon the 20th of January, 1902, Adams individually had a balance of $10 to his credit on the books of the grocer company, and on the 10th of February following he leased the plantations from Mower, for $2,-000, for the crop year ending December 12, 1902, by a written instrument, duly recorded, in which the lessor waived his privilege, to the extent of $0,000 — $S per bale of cotton— and interest, in favor of any one who might advance the money and supplies necessary to make and harvest the crop. Thereafter, but without entering into any specific contract to make such advances, the grocer company, during the months of March, April, and May, shipped to Adams, upon his orders, supplies, such as are required for plantation use, to the amount of $1,230.60. From the correspondence between the parties, it appears that the supplies thus shipped were sold upon practically a cash basis, or on short time, and by May 5th Adams had paid on account $719.37, and he subsequently, in November, paid the further sum of $25. In the meanwhile, on April 26th, he,entered into a written contract with the S. R. Hughes Company, of Vicksburg, whereby the latter agreed to advance him $5,000 for the making of the crop of 1902, and Adams pledged the crop therefor, and agreed to ship the same to said company. The contract so made was recorded upon the day of its date, and we conclude that the grocer company did not long remain in ignorance of what had been done. In fact, upon May 5th the Hughes Company, under its contract with Adams, paid to the grocer company the sum of $444.37 on account of Adams’ indebtedness to it; and on July 25th Adams wrote to its representative, concerning the balance still due by him: “Your letter of the 22nd rec’d and noted. I will come over and see you just as soon as possible, and arrange to pay the account I owe. I can give you my note, payable in November. Things worked backwards with me or you would have had it some time ago, as I was only allowed so much per month, and all stuff is bought at the office of my commission merchants or I would have continued to have given you orders and paid up same, but they wanted the commission on stuff bought and I had to agree to same.”
There was some further correspondence, and then a conversation through the telephone, to which the representative of the grocer company, in a letter to Adams of date November 11th, refers as follows: “Agreeably to our conversation by phone yesterday, I enclose statement of your account and two drafts concerning same, one, at sight and one, payable December 10th next, both, drawn on Messrs. S. R. Hughes Co. of Vicksburg, Miss. You will kindly sign and return both promptly.” It appears that the drafts thus mentioned were given November 14th, and that when he gave them Adams was expecting to make a shipment of cotton, but was unable to do so, and hence that when the sight draft was presented the Hughes Company declined to pay it, and wrote to the grocer company saying: “We were advised by Mr. Adams that these drafts had been given you to hold until sufficient cotton had been shipped in to pay them. Mr. Adams still owes us a large account and until we are paid we cannot take up your drafts as our Mr. Hughes explained to your Mr. Reily when he was in this city.” The grocer company then (November 20th) wrote to Adams, inclosing a copy of the letter that they had received, and saying: “We are, of course, much surprised and disappointed at the view that these gentlemen take of the matter and their refusal to honor your draft. * * * You will note, in the latter part of their letter, references made to a conversation with our Mr. Reily. This took place some two or three months ago and we do not think should affect the present situation and your arrangements with Messrs. Hughes & Co. The arrangement, at that time, was, that we *65 were to get you, at that time, to give us a draft on them for the amount of your account; they would pay it as soon as your shipment of cotton would justify. We understand the situation, now, as you éxplained, there is ample cotton in their hands, or en route to them, to pay what you aré due them to date and also to take up our draft.” To this the grocer company received a reply from Adams, of date November 21st, saying that he had not shipped more cotton because he had been unable to get the necessary cars, and that the Hughes Company would not pay the drafts until the cotton actually reached it; and the representative of .the grocer company wrote back: “Your favor of the 21st to hand and, with your explanation given, I fully understand the situation. Of course, had I known that the cotton had not gone forward I would not have sent the draft. However, I guess no harm has been-done.” Upon November 21st Adams shipped to the Hughes Company 24 bales of cotton; upon November 25th, 5 bales; upon November 27th, 24 bales; and upon December 8th, 27 bales; so that upon or shortly after the date last mentioned the Hughes Company had received from him, including previous shipments, and also including 2 bales from the crop of 1901-1902, 131 bales, worth, as per its account sales, $5,792.99. Nothing further was done, however, in the matter of the claim of the grocer company, until some time in December, when its representative, Colbert, visited Adams at his plantation, and learned of the- shipments that he had made. He also found that Adams had apparently about 150 bales of cotton in the field, which he was getting out as rapidly as he could, being much retarded by wet weather. Being asked, “Did you see anything on the plantation to lead you to believe that he was concealing, parting with, or disposing of his crop to the prejudice of the plaintiff in this case, other than his statement that he had to ship his cotton to the S. R. Hughes Co.?” Colbert answers, “No, sir; I didn’t notice anything but that.” Colbert then (probably after Christmas) went to Vicksburg, and, calling upon the Hughes Company, endeavored to obtain payment of the drafts heretofore mentioned, which the grocer company still held. He was, however, told that Adams had overdrawn his lien, and was sending in orders for more supplies, which the Hughes Company was filling, and payment of the drafts was again refused. Mr. Hughes says: “I told him that we could not pay the Southern Grocer Company’s drafts; that we advanced all that we could under the agreement with Mr. Mower; that he could as well afford to hold the drafts and wait on Mr. Adams as we could; that I thought there was sufficient cotton there to pay us all, and I didn’t see why they, couldn’t wait on Mr. Adams for four or five hundred dollars, when we were waiting on him for two or three thousand.”
Upon receiving the report of these interviews, the grocer company, on January 3, 1903, wrote to Adams, returning the drafts and requesting an immediate remittance of the balance due on its account; and this was followed on January 4th by the institution of suit, and by the issuance of writs of attachment and sequestration, under which Adams’ cotton then in the field was seized. In the petition filed by it, the plaintiff alleges that the supplies furnished were necessary for the making of the crop, and that it had a lien and privilege for the price of the same. It further alleges that defendant “is insolvent, and that he has mortgaged, assigned, and disposed of, and is about to mortgage, assign, and dispose of, his property, rights, and credits, or some part thereof, with the intent to defraud his creditors, or give an unfair preference to some of them, and especially to defraud petitioner; that he has converted and is about to convert his *67 property into money or evidence of debt, with intent to place the same beyond the reach of his creditors, especially petitioner; * * * that defendant has already parted with and disposed of a large part of the cotton crop, cotton seed, and other crops raised on said property during the year 1902, to the prejudice of its [petitioner’s] lien and privilege; and * * * that it fears and believes that defendant will conceal, part with, or dispose of the remainder' of said crop during the pendency of this suit, and to the prejudice and destruction of plaintiff’s lien and privilege.”
The writs were issued as prayed for, and a motion to dissolve them, with damages, was filed on behalf of Adams, and referred by the court to the merits, whereupon Adams pleaded the general issue. Mower then intervened, setting up his contract of lease, alleging that he had been paid $000 on account by the Hughes Company, and claiming a balance of rent amounting to $1,400, with lessor’s privilege priming that of the plaintiff. The Hughes Company also intervened, claiming a balance of $1,900 for advances made to Adams under its contract of April 26th, together with interest and attorney’s fees, and recognition of its privilege as priming those of the other litigants. The interventions were answered by the plaintiff, and upon the issues thus presented the case was tried, and the facts as herein-before stated, -as also other facts which will now be stated, were developed. The Hughes Company produced its account with Adams to January 30, 1903, showing debits amounting to $13,230.82, credits amounting to $10,-792.90, and a balance against him, as of the date of the account, of $2,437.83. From this account, it appears that Adams is charged with the amount of Ins note ($5,000) given pursuant to his contract with the Hughes Company upon April 26th, and with interest, at the rate of 10 per cent, per annum upon the whole amount from that date; but, whilst he is also credited with the amount of the face of the note as of date April 26th, he is not credited with interest upon so much of the proceeds as remained in the hands of tlie Hughes Company, and is therefore charged for the use of money with which the lender had not parted, and which, to a great extent, it exercised its own discretion in thereafter advancing. Passing this, we find among the debits an item of $620, being commission of $1.25 a bale on 496 bales of cotton not delivered. This is in accordance with the contract, whereby Adams agreed to ship 625 bales, or pay $1.25 for each bale that he was short of that number, but it does not constitute a proper charge as for supplies furnished, and is not secured by a privilege. " This fact seems to be recognized by Mr. S. R. Hughes, of the company of that name, as also the fact that the account, as filed by the company, contains some items which do not explain themselves; and he gives the following testimony upon cross-examination, to wit:
“Q. Now, is it not a fact that your account with Mr. Adams, and the advances which you made to him, largely exceeded the amount stipulated in the actual pledge and mortgage entered into between him ‘and your firm? A. On the face of the books, yes; it does exceed that amount; but, so far as the advances to Mr. Adams are concerned, they are within the limit. Q. Then I suppose that this account of S. R. Hughes & Oo. against Brooke Adams does not show the actual condition of affairs between S. R. Hughes & Co. and the defendant? A. It shows the exact status of the account. Q. Well, how much supplies, or how much money and supplies, then, has this firm advanced him? A. I just put it down in lead pencil— I thought you would ask me that question— $6,635.93. Q. How do you account for the charge of $13,230.82? A. In that amount is *69 included the note and interest, $5,304.17; the commission on the shortage of cotton, $620; interest, $70.72; and then the amount we advanced to Mr. Mower on account of his rent, $600; which, deducted from the total debits, $13,230.82, leaves the net amount furnished to Mr. Adams $6,635.93. Q. What does Mr. Adams owe S. R. Hughes & Co. at this time — how much? A. I think the amount shows there — $2,437.83. Q. How do you arrive at that balance? A. By crediting him with the proceeds of the cotton-129 bales of cotton that have been shipped in — and crediting him with the proceeds of that note, $5,000. Q. What is the aggregate value of the proceeds of "the cotton which he has shipped to S. R. Hughes Company? A. $5,792.99.”
Considering this testimony in connection with the account to which it refers, we find that in the latter part (say prior to the 30th) of December, when the grocer company, through Colbert, demanded the payment of its draft, the situation, as between the Hughes Company and Adams, allowing the former interest at 10 per cent, on the proceeds of the $5,000 note from April 2Gtli to December 1st, appears to have been as follows:
Total debits, as shown by account..........'$13,230 82 Less amount of note................. $5,000 00 Less amounts debited Dec. 30 and a fforwitniic * Dec. 30. C. h! Lucas, sheriff...... 624 80
Jan. 8. Willie Love .............. 50 00
Jan. 10. Mdse. Crook Co........... 109 21
Jan. 17. Draft, Tobe Polk......... 15 00
Jan. 23. Draft favor of self....... 10 00
Jan. 30. Interest on overdft to date 70 72
Jan. 30. Com. on 496 B/C not delivered, at $1.25.................. 620 00 Less amount paid Mower for rent.. 600 00 --- 7,099 73
$ 6,131 09 By 131 bales of cotton, sold and unsold...... 5,792 99
Bal. due ..................................$ 338 10
Beyond this, it seems to ns quite likely that some of the disbursements charged in the account were made in settlement of debts due by Adams for the operations of the previous year, and we find from the admissions of counsel that the balance now claimed in the brief of counsel to be due to Mower for rent is but $1,163, from which it appears that he must have been paid by some one $837, instead of $600, whilst the balance claimed to be due to the Hughes Company is $1,817.83, instead of $2,437.83.
Upon the case as presented, the district court rendered judgment in favor of the grocer company and against Adams in the sum of $570, with interest and recognition of privilege; in favor of Adams and against the grocer company, quashing the writs of attachment and sequestration, and condemning the grocer company to pay $2,000 as damages alleged to have been sustained by reason of the issuance of the writs and the seizure thereunder; in favor of the Hughes Company and against Adams for $1,900, with interest and attorney’s fees, and with recognition of privilege as priming those of the other litigants; and in favor of Mower against Adams for $1,400, with interest and attorney’s fees, and with recognition of privilege as superior to that of the plaintiff, but inferior, by reason of having been waived, to that of the Hughes Company. From the judgment so rendered the plaintiff alone appealed, and the defendant Adams alone answered the appeal, and that only to ask for an increase in the amount allowed as damages. The judgment appealed from was affirmed hy the Court of Appeal, and the plaintiff has brought the matter before this court for review.
Opinion.
It is beyond dispute that the debt claimed by the plaintiff is due for necessary supplies furnished to the defendant’s plantation in the year 1902, and, although they appear to have been furnished with the expectation that they would be paid for within a short time, and without reference to the making and harvesting of the crop, nevertheless, as that expecta *71 tion was not realized, and as tlie transaction falls within the language and meaning of Civ. Code, art. 3217, the plaintiff is entitled to the privilege accorded by that law. Nor was that privilege superseded by the privilege subsequently acquired by the Hughes Company by virtue of the registry of its contract with Adams, and the advances made pursuant thereto. Flower & King v. Skipwith, 45 La. Ann. 895, 13 South. 152; Hewitt v. Williams, 47 La. Ann. 752, 17 South. 269. The privilege of the lessor, which had been previously acquired, primed that of the plaintiff. Flower & King v. Skipwith, supra; Act No. 89, p. 127, of 1886. But the amount called for by the lease was $2,000, and it is quite clear that, if the lessor chose to waive his rights in favor of the holder of a privilege inferior to that of'the plaintiff, he could only put such holder in his shoes, and could confer on him no greater rights than he himself possessed; i. e., a privilege priming that of the plaintiff to the extent of $2,000. In other words, by no agreement between the holders of privileges first and third in rank can the holder of a privilege second in rank be subordinated to both the others. The lessor, however, did not waive his privilege in favor of the Hughes Company, but in favor of any one by whom supplies might be furnished; and, as the plaintiff was the first to furnish such supplies, the waiver inured first to its benefit, so that, there being no laborers or overseer in the case, the privilege of the plaintiff became first in rank; the privilege of the Hughes Company, up to an amount which, added to that due the plaintiff, is covered by the waiver of the lessor, became second in rank; and the privilege of the lessor followed thereafter.
There is no doubt that it was competent for the plaintiff to waive its privilege, even as the lessor had done; and if the Hughes Company had agreed to make advances up to the full amount covered by the waiver of the lessor, and the plaintiff had waived its privilege, in favor of the Hughes Company, up to that amount, it could not then have come in between the Hughes Company and the lessor, since that would have been to extend the waiver of the lessor by the amount of its (the plaintiff’s) claim. But the lessor waived his privilege to the extent of $6,000 — $8 per bale of cotton — and interest on any advances made within those limits, whereas the Hughes Company agreed to advance but $5,000. Hence the supplies furnished by the plaintiff and the advances called for by the contract of the Hughes Company, taken together, were within the waiver of the lessor, and it can be a matter of no concern to him which of the two is'accorded preference over the other. As between the plaintiff and the Hughes Company, it appears that probably in July or August there was an interview between Reily, representing the one, and Hughes, representing the other, in which it was understood that Reily was to get from Adams a draft on the Hughes Company for the amount of the plaintiff’s claim, which draft the Hughes Company was to pay when the shipments of cotton by Adams were sufficient to secure the advances made by it under its contract, and to show a surplus available for that purpose. This understanding was not acted on at the time, and later, in November, when the two drafts were given to the plaintiff by Adams, it is' evident that they were given with the understanding that the cotton which Adams had shipped and that he was about to ship, making 129 or 131 bales, was sufficient for the purposes stated, and that the plaintiff’s draft would be paid. It would be unreasonable to suppose, and the evidence does not justify the supposition, that either in the interview between Beily and Hughes, or when the drafts were obtained from Adams, the plaintiff acted in the dark, and agreed to wait until the Hughes Company was reimbursed its advances, without knowing or inquiring what advances were *73 called for by its contract; and it would be equally unreasonable to suppose that the plaintiff agreed to await the reimbursement to the Hughes Company not only of advances to an indefinite amount beyond its contract, but the payment to that company of the $1.25 a bale forfeit for cotton not raised, the payment to the lessor of the rent which he had waived, and the payment of other obligations due by Adams, but not secured by privilege on the crop. When, therefore, as the result of Colbert’s interview with Hughes in December, the plaintiff, knowing that the Hughes Company had received from Adams 129 bales of cotton, not including 2 bales of the crop of the previous year, worth nearly $6,000, and knowing that its contract called for advances to the amount of only $5,000, was informed that there were still two or three thousand dollars due to the Hughes Company by Adams, it naturally concluded that it was being made to wait until the Hughes Company should be reimbursed advances not called for by its contract, and not within the agreement under which the drafts held by it had been received; and that conclusion was a just one, for the Hughes Company was making the plaintiff wait until it collected the entire balance of account due to it by Adams, including amounts advanced in excess of its contract; amounts for which it had no privilege on the crop, such as the forfeit of $1.25 a bale for cotton not shipped by Adams; and amounts the privilege for which had been subordinated as well to its own privilege as to that of the plaintiff, such as the $600 or $800 of rent paid to the lessor. So far as Adams is concerned, there was no intention on his part to defraud the plaintiff or any other creditor, and the affidavit to that effect, and the writ of attachment predicated upon such affidavit, were unwarranted, but, as he himself wrote, he was in the hands of his commission-merchants, and was unable to comply, or to compel the latter to comply, with what we understand to have been his agreement with the plaintiff; i. e., that the drafts given to the plaintiff should be paid as soon as the Hughes Company was reimbursed the advances made by it within the limits of its contract. We are therefore of opinion that the plaintiff had good reason to fear that Adams would part with or dispose of the crop, not with intent to defraud it, but to the prejudice of its privilege, and that the affidavit to that effect was well founded, and the writ of sequestration properly issued. The charges contained in the affidavit for the attachment do not appear to have seriously affected the standing of Adams in the estimation of those among whom he lives, but they were uncalled for and injurious to his feelings. His principal loss, however, resulted from the seizure of his crop and the consequent disturbance of his business arrangements; but, as this must have resulted from the seizure under the writ of sequestration, even if the attachment had not issued, he is not entitled to recover on that account from the plaintiff. Neither the defendant, the lessor, nor the Hughes Company having appealed from the judgment of the district court, and neither of them making any complaint in this court of the judgment of the Court of Appeal affirming the judgment of the district court, it follows that, as between them, and in so far as said judgment is in favor of the plaintiff, it must remain undisturbed.
It is therefore ordered, adjudged, and decreed that the judgment of the Court of Appeal here made the subject of review be amended in so far as to amend the judgment of the district court in the following particulars, to wit:
(3) By maintaining the writ of sequestration issued on behalf of the plaintiff, rejecting the claim of the defendant for damages alleged to have been sustained by reason of the issuance of said writ, and reducing the amount otherwise allowed the defendant as damages to $100.
(March 28, 1904.)
(2) By recognizing the plaintiff as entitled, for the amount of the judgment in its favor, to a privilege on the property seized superior to that of the interveners.
(3) By directing that the costs incurred by the plaintiff in the district court, save those incident to the attachment, be included in the judgment in its favor.
It is further ordered, adjudged, and decreed that said judgment of the Court of Appeal be otherwise amended in so far as that 'the costs of the appeal to that tribunal be paid by the interveners. And it is further ordered and adjudged that said interveners pay the costs of these proceedings.