(41 South. 480.)

No. 15,737.

NATIONAL BANK OF COMMERCE v.
SULLIVAN (UNION OIL
CO., Intervener).

(April 23, 1906.   Rehearing Denied June 4,
1906.)

**1. AGRICULTURE—LIENS ON CROP—ADVANCES
—EXTENT OF LIEN.**

The right of pledge, in favor of the furnisher of money, resulting from the execution and registry of the written instrument authorized by Act No. 66, p. 114, of 1874, is intended to bear upon the crop as security for the reimbursement of the money that the planter "may require" for necessary expenses of the crop and plantation, and not as security for money which has already been advanced and used before the execution and registry of the instrument.

**2. CONTRACTS—BREACH—DEFENSES—WAIVER.**

Where a planter in consideration of advances made and to be made by the factor agrees to ship his crop of cotton to the latter, or to a consignee to be designated by him, but without the knowledge of the factor ships the greater part of the crop to some one else, it is no answer to the charge that he has violated his contract to say that the factor failed to designate a consignee, and, after being informed of the partial shipment already made, received the promise of the planter that the balance of the crop would be shipped according to the contract and that by these acts he waived his rights in the premises.

**3. AGRICULTURE — LIEN FOR ADVANCES —
BURDEN OF PROOF.**

The crop privilege conferred by Civ. Code, art. 3217 (in so far as it relates to that subject), is intended to secure the reimbursement only of money which, having been advanced, is actually used, for the purchase of necessary supplies and the payment of necessary expenses for the farm or plantation, and it is for the person seeking to enforce the privilege to prove that the money claimed by him was so used; otherwise, no privilege can be recognized.

**4. CONTRACTS—BREACH—KNOWLEDGE.**

Where a planter obtains advances for the making of his crop from a bank where he keeps an account in which he deposits other funds than those advanced, the fact that the bank collects the proceeds of a draft drawn by him on a cotton seed oil company and credits same to his account cannot be presumed to convey notice to the bank that the planter had sold his cotton seed in violation of his contract with it.

**5. AGRICULTURE—LIEN FOR ADVANCES—PROPERTY SUBJECT—SALE.**

The privilege for advances conferred by Civ. Code, art. 3217 is not confined to the growing crop, but bears upon the products after they are severed from the soil, and follows them into the hand of a purchaser, who, buying directly from the planter, is presumed to know that such privilege may or actually does exist.

(Syllabus by the Court.)

Appeal from Tenth Judicial District Court, Parish of Concordia; John S. Boatner, Judge.

Action by the National Bank of Commerce against J. B. Sullivan, in which the Union Oil Company intervened. From a judgment for plaintiff, defendant appeals. Affirmed in part, and reversed in part.

Samuel Lucius Elam, for appellant; Samuel Lucius Elam and T. M. & J. D. Miller, for appellant intervener. Dagg & Dale, for appellee.

Statement.

MONROE, J. Plaintiff sues on three notes of $1,600, $1,500, and $4,000, dated July 9, August 16, and September 26, 1904, respectively, and on open account for $1,440.25, all for advances alleged to have been made to the defendant for the purposes of the crop of 1904 on Dunbarton plantation in the parish of Concordia. It alleges that it has a privilege for the whole amount claimed, and also a right of pledge resulting from a written instrument duly recorded, and it prayed for a writ of sequestration, and for judgment with recognition of its privilege, and pledge on the products to be seized. A writ of sequestration was accordingly issued under which certain cotton and cotton seed were seized on Dunbarton plantation and elsewhere and, thereupon, the Union Oil Company intervened, alleging that the sheriff had taken 129 tons of seed which it (intervener) had bought, paid for, and had in its possession, and praying judgment for the same with damages. To this intervention, plaintiff answered, averring that when intervener made the alleged purchase it was well aware of plaintiff's privilege and right of pledge, and adopted the course pursued by it for the purpose of defeating the same, and it prays for judgment not

only with respect to the seed actually taken into custody by the sheriff, but, also, with respect to certain other seed which the intervener acquired possession of, not as plaintiff alleges by virtue of a sale, but by virtue of a fraudulent giving in payment by an insolvent debtor. The defendant, after moving unsuccessfully to dissolve the sequestration, filed an answer, denying the allegations of the petition, and setting up some other matters which are not insisted on and need not be considered.

The facts of the case appear to be as follows:

Defendant was regarded as a man of means, and enjoyed a good credit, and his embarrassed condition, as made known through the transactions out of which this litigation arises and more particularly, perhaps, through the litigation itself, appears to have been a matter of surprise to those with whom he was doing business. He owned a residence in Natchez, and a valuable plantation in the parish of Concordia, La., which was made up of four contiguous tracts or plantations, known as "Dunbarton," "Fairview," "McCarthy," and "Ramshorn" "(or Ross & Marks)," respectively; the whole operated under one management, as one plantation, and known as "Dunbarton." On April 18, 1904, he entered into a verbal contract with plaintiff to the effect that the latter should advance him money to the extent of $12,000 for the making of his crop for that year. What then occurred is stated by the assistant cashier of the bank in the following language, to wit:

"He said he wanted $3,000 on that day. I told him I would let him have the $3,000, but, owing to the importance of the transaction, would not attempt to prepare the papers myself, but would have the necessary act of pledge drawn up which he could sign at a later day. He, then, before the pledge was executed, wanted $3,000 more, which we let him have, as evidenced by note dated May 31, 1904. On July 9th, I had the necessary paper and this pledge was executed, and another note for $1,600, dated July 1st [9th] was made."

Referring elsewhere to this matter, the witness testifies as follows:

"Q. How much had the bank advanced to Sullivan for his crop at the time the pledge was signed? A. $7,600. * * * Q. The pledge describes three notes—one for $3,000, dated April 18, 1904, one for $3,000, dated May 31, 1904, and the third for $1,600, dated July 9, 1904. Had the money evidenced by these notes been advanced to Mr. Sullivan prior to the execution of the pledge? A. It had."

The act of pledge referred to reads in part as follows:

"Personally came * * * J. B. Sullivan * * * who declared * * * that he has this day borrowed from the * * * bank * * * the sum of $7,600 * * * to enable him * * * to cultivate, make, and produce a crop of cotton, corn, and other produce on his Dunbarton plantation * * * during the year 1904, for which amount the said James B. Sullivan has executed his three promissory notes * * * for $3,000, dated April 18, 1904, * * * for $3,000, dated May 31, 1904, * * * and for $1,600, dated July 9, 1904, * * * and the said appearer hereby declares that in order to fully secure the * * * bank * * * in the full and final payment of the said notes and said advances so made, or that may hereafter he made, * * * he does hereby give and grant, * * * in addition to the privilege now conferred by law to the furnisher of supplies. a lien and pledge upon all the cotton, cotton seed * * * raised or produced by him, either by himself, his tenants, * * * on said plantation. It is further agreed that said J. B. Sullivan will cultivate his said crop, gather and prepare same for market as soon as practicable, and, as soon as same is prepared for market, will ship the same to the * * * bank * * * or to any commission merchant designated by them, to their account; the proceeds thereof shall be applied to the extinguishment of the advances so made, or, at the option of the * * * bank * * * shall be applied to any other or additional amount advanced that may not be secured by an act of pledge, as the bank may see fit. * * * It is agreed that this is a Louisiana contract, and the enforcement, if necessary, shall be governed by the laws of the state of Louisiana."

About September 1st, following the foregoing, the defendant agreed with H. & C. Newman, of New Orleans, to ship to that firm his entire crop of cotton, less about 60 bales which he shipped to J. Weis & Co. of New Orleans, and when and as the cotton was picked and ginned, he shipped it accordingly —367 bales to Newman and 61 bales or 63 bales to Weis; all of which was without

plaintiff's knowledge or consent. On September 26th or 27th he sold to the intervener for future delivery 300 tons of cotton seed from the Dunbarton crop of 1904, for which intervener paid, in advance, by honoring his drafts, of September 28th for $1,500, and of October 4th for $2,000, and this, also, was done without the knowledge or consent of plaintiff; in fact, as late as January 5th, 1905, plaintiff wrote to defendant:

"You are aware we have a crop pledge on your cotton, cotton seed, corn, etc., recorded, and this pledge promises all cotton shall be shipped for our account. Please accept this as notice that no cotton, or seed, or corn, must be shipped or sold, except for our account, until this indebtedness is satisfied."

To which defendant replied, on January 6th:

"No cotton, or anything, will be shipped until you are paid, which will be in four or five days; some time next week."

It is fair to say that defendant's arrangements with H. & C. Newman had up to that time enabled him to pay to plaintiff the two notes of $3,000 each, mentioned in the act of pledge, as also a note of $3,500, which he had previously given to plaintiff in a different matter, and that he appears to have entertained the hope (which was not realized) that Newman would pay the balance of his debt to plaintiff. It was part of intervener's understanding with defendant that it should send for the seed for which it had contracted when the river (Tensas) should have become navigable, and, on Thursday, January 18, 1905, the steamboat J. W. Swayze was dispatched on that mission, the general situation at that time, so far as these litigants are concerned, being about as follows: For a day or two before there had been a movement looking to the attachment by plaintiff of defendant's store (a general store at Dunbarton), and one of the counsel who now represents both intervener and defendant had been consulted and had prepared the necessary papers, in the doing of which

he had occasion to read the act of pledge here relied on by plaintiff. So far as the attachment was concerned, however, the matter was arranged by the defendant consenting that the stock in the store should be sold and the proceeds divided among his creditors, and there having been some suggestion of a purpose on the part of the plaintiff to seize the cotton seed now in dispute, the counsel above mentioned stated or intimated that he would be unable to represent the plaintiff; his reason (whether given or not) being, that he was the regularly retained counsel of the oil company. He was then called elsewhere, and, on the following day, the captain of the Swayze (who, and whose boat, have been in the employ of the intervener for some years), telephoned to the office of intervener for instructions, and was directed by some one in charge to go after the seed at Dunbarton, which he at once proceeded to do. Later on the same day Skipwith, intervener's manager who had been temporarily absent, and was uninformed as to what had just taken place, met defendant on a railroad train and was told by him that his (defendant's) affairs were in bad shape, though there was a prospect that Newman would straighten them out, and he was asked whether intervener's seed had been taken from Dunbarton, to which he replied that he did not know, whereupon defendant suggested that he had better move the seed as soon as he could. The boat which had been sent for that purpose arrived at Dunbarton that same evening (probably whilst the conversation thus mentioned was going on) and the captain there found Lee, the manager of the plantation, who had previously been informed by defendant that the seed had been sold to, and would be called for, by intervener, and who was, therefore, ready to deliver it. The loading of the boat, accordingly, began on Friday morning, and continued until 3,555 sacks, which was as

much as she could carry, had been placed on board, and on Saturday she steamed to Clayton, a station at which, as we understand the testimony, the railroad touches the river, and where it was the purpose to discharge the cargo; the understanding being, that the boat was then to return to Dunbarton for the balance of the seed, consisting of loose seed, "estimated" at about 20 tons, and seed in sacks, also "estimated" at about 500 sacks. On the arrival of the boat at Clayton part of the cargo was discharged and put in warehouse or on cars, and of that part 168,200 pounds was subsequently seized by the sheriff and bonded by intervener, who also retained possession of the balance of the cargo (as shipped on the Swayze, consisting of 276,195 pounds) as will be hereafter stated. On the day (Saturday) upon which the Swayze left Dunbarton, defendant visited the plaintiff bank in Natchez and had an interview with the officers, in which he informed them of the shipment of cotton which he had made to Weis, and of the sale of the seed to intervener, and in which, no doubt, his previous shipments to Newman (of which plaintiff had learned some five days before) were referred to, and as a result of which, he executed an instrument, reading (save the merely formal part), as follows:

"Jany 21, 1905."

"Gentlemen: I hereby agree and promise to ship the cotton and cotton seed now on my Dunbarton plantation * * * to you at Natchez, Mississippi—the cotton, in care of Rumble, Wensel Co, and the seed, in care Natchez Oil Co; said shipments to be made on first boat to arrive at the landing."

In executing this instrument, defendant informed plaintiff that there were then at Dunbarton 79 bales of cotton and between 250 and 300 tons of seed, and he promised, as he was about going to the plantation, that he would wire on his arrival whether the seed was still there, from which it is evident that plaintiff was given to understand that there was some reason to apprehend that it might have been removed, though we are not led to infer that defendant told plaintiff that he had on the preceding Thursday advised the intervener to remove it as soon as practicable. Defendant reached Dunbarton on the following day (Sunday, July 22d) and learned what had taken place, but he left the "wiring" to an agent of plaintiff whom he found on the spot, and, either through the latter, or in some other way, plaintiff learned of the situation, and immediately caused the issuance of the sequestration under which the sheriff seized 100,580 pounds of seed, which had been left on the plantation, as also some cotton, amounting, as we understand, to 52 bales, and under which he proceeded to Clayton and boarded the Swayze, as that boat was about moving over the Catahoula side of the river, but without stopping the boat or seizing her cargo. He, also, as has been stated, seized 168,200 pounds of seed, which had been discharged at Clayton, and which, with that seized at Dunbarton, was subsequently bonded by intervener. It may also be here stated that plaintiff bonded the cotton which was seized at Dunbarton, and that the same was afterwards sold, and the proceeds amounting to $1,185.12, applied in reduction of plaintiff's claim.

The two notes of $3,000 each, mentioned in the act of pledge, were, as has been stated, paid, the amounts represented by the other note of $1,600, mentioned in the pledge, and by the notes of $1,500 and $4,000, and by the claim on open account, for $1,440.25, are shown to have been furnished by plaintiff, to defendant, and to be unpaid. Plaintiff insists that its entire claim is secured by the act of pledge, but even if that be not so; having contracted with defendant to make advances for the purposes of a crop, that it has a privilege for the whole amount advanced irrespective of the use to which the money was actually applied; and on the trial below it objected to the introduction of testimony going to show that a large propor-

tion of the money advanced was used for other purposes than the making of the crop. There was, however, some testimony on that subject which found its way into the record, from which the judge a quo concluded that nearly $6,000 was actually used for crop purposes. There was judgment in the district court in favor of plaintiff, and against defendant, for $8,540.25, with interest, recognizing the privilege and right of pledge asserted by plaintiff, maintaining the seizure, as made, decreeing that the $1,185.12, realized from the cotton be applied as a credit on the open account, that intervener surrender the seed bonded by it, or pay plaintiff $1,340, and that intervener pay plaintiff $1,794 as the net proceeds of the seed taken by it and not seized by the sheriff; the whole judgment against intervener to be credited with $2,000, being the amount of its check, given to plaintiff in payment of defendant's draft for that amount. The defendant was condemned to pay the costs of the main action and the intervener those of the intervention. Defendant and intervener have appealed and plaintiff has answered, praying that the judgment be amended.

## Opinion.

Plaintiff agreed to make advances for the purposes of the crop to be made in 1904 on Dunbarton plantation (which plantation, we find, included the several tracts, or plantations, known as "Fairview," "McCarthy," "Ramshorn," or "Ross & Marks," and "Dunbarton," proper), and it was part of the agreement that the advances should be secured by a written pledge of the crop, to be thereafter executed and recorded. But, without waiting for that security plaintiff advanced $7,600 represented by the notes of April 18th, May 31st, and July 9th, and when, upon the date last mentioned, the act of pledge was executed, that amount, representing the aggregate proceeds of the three notes mentioned, was the only specified amount which it purported to secure. The

law (Act No. 66, p. 114, of 1874) which is relied on as authorizing a pledge so peculiar in its character, however, provides that the planter "may pledge his growing crop, * * * for advances, in money, goods, and other necessary supplies, that he may require for the production of the same," and we do not understand this to mean that he may so pledge his crop for advances which have already been received and consumed. In other words, we do not understand that a factor may advance money and supplies without a pledge of the crop, and, after the advances have been made, perhaps, at the end of the season, and after the crop has been gathered, avail himself of the benefit of the act of 1874 by taking a pledge, the authority for and the legality of which is made dependent upon other conditions. No one will pretend that, quoad a crop not delivered into his possession, a right of pledge can exist in favor of the furnisher of supplies (whether as between him and the planter or as between him and anyone else) unless it be acquired under the act of 1874, and since, as we have seen, that act authorizes such a pledge as security only for advances which the planter may require, it follows that an attempt in that way and without delivering it into the possession of the pledgee to pledge a crop for advances which have already been made and used, must be abortive, as to the parties themselves and all the world.

It is said, however, that the act of pledge here relied on was intended to secure not only the $7,600, which had already been advanced, but also any further sum that might be advanced. We do not so understand the act. It may be conceded that the original agreement contemplated that the advances to be made should be secured by pledge, but the act of pledge, as executed, specified a particular amount, already advanced and used, as representing the particular debt to be secured, and, toward the end of the instrument, we find the following, to wit:

"Said J. B. Sullivan will cultivate his said crop * * * will ship the same to * * * the * * * bank * * * or to any commission house designated by them to their account; the proceeds thereof shall be applied to the extinguishment by them of the advances so made, or, at the option of the * * * bank * * * shall be applied to the payment of any other or additional amount advanced that may not be secured by an act of pledge, as the said bank may see fit."

From which, and from the positive and reiterated statements of the plaintiff's witnesses, to the effect that the contract with the defendant called for no advances save for crop purposes, it is evident that it was within the contemplation of the parties that some of the advances under the contract should be secured by pledge, and some should not, and our conclusion is that the only advances to be included in the class first mentioned were those specifically referred to in the act of pledge, but for which, as we have seen, the property could not be pledged without being delivered into the actual possession of the pledgee. We therefore conclude that plaintiff has no pledge. It is, however, secured, to the extent of the privilege accorded by Civ. Code, art. 3217, "on the crops of the year and the proceeds thereof," which privilege is conferred in the same terms as those of the laborers by whom the crops are made, of the lessor upon whose land they are made, and of the overseer under whose supervision they are made, and, as there is neither laborer, lessee, nor overseer before the court, it follows that for the purposes of this suit the privilege of the plaintiff, to the extent mentioned, is paramount to any other claim upon the crops made on Dunbarton in 1904, and upon the proceeds thereof.

The learned counsel for defendant (who also represents the intervener) argues that, quoad the defendant, the sequestration should be dissolved, because the plaintiff made no inquiry, as to the disposition of the crop during the crop year, and because, failing to designate a consignee, it is presumed to have waived its rights in the premises. The argu-

ment is predicated in part upon an error of fact. Baker, the assistant cashier of the bank, testifies that he inquired about the crop in November, 1904, and that defendant told him that he had neither ginned nor shipped any of his cotton, and would not attempt to operate his gin because the weather was too fine, and because he had no water, and after that it does not appear that defendant ever notified plaintiff that the crop was prepared for the market or ever gave plaintiff an opportunity to designate a consignee; the shipments to Newman and Weis having been made without its knowledge, as had been the agreement for the sale of the seed. It is also argued that when plaintiff accepted defendant's written obligation of January 21, 1905, to ship the cotton and seed then on his plantation, it did so with full knowledge of all that had been done, and hence waived its right to make a seizure for any cause which may have existed prior to that time. We do not, however, find that plaintiff did anything more than accept the obligation referred to, and there is nothing in that, nor is there any evidence in the record, from which any waiver can be deduced. It is further argued that Civ. Code, art. 3217, confers a privilege only "for money actually advanced and used for the purchase of necessary supplies and the payment of necessary expenses for any farm or plantation, on the crops of the year and the proceeds thereof," and that it was incumbent on plaintiff to show what proportion of the amount claimed by it was devoted to those purposes. As the main proposition is stated in the language of the law, there can be no denying its soundness, and the other is a corollary. The question is, "what does the language of the law mean?" This question has been answered by our predecessors as follows:

"The account is generally attacked on the ground that the proof does not adequately establish the necessary nature of the supplies. It is said that the showing of such necessity is an essential element of proof, to create the privi-

lege. Such was, undoubtedly, the rule under Civ. Code, art. 3217, which, in terms, gave the privilege for money actually advanced and used."

But the act of 1874 has made an important modification of our law on this subject. It provides:

"That, in addition to the privilege now conferred by law, any planter, or farmer, may pledge, or pawn, his growing crop * * * for advances * * * that he may require for the production of the same." It is as plain as words can make it that the privilege which, formerly, was made to depend not only on the advance of the money, but, also, on its actual use for necessary purposes, is, now, caused to result from the advance of the money * * * that may be required by the planter."

And, it being found in the case then under consideration that the third opponents had a pledge, executed and recorded in conformity to the act of 1874, it was held that they were not called on to prove the actual use of the money advanced for the purpose for which it had been required. Laloire v. Wiltz, 31 La. Ann. 439.

In the instant case, the plaintiff, as we have seen, is not protected by such pledge, but its learned counsel contends that the law has been differently construed in Hewitt v. Williams, 47 La. Ann. 742, 17 South. 269, and that the interpretation adopted in that case has become a rule of property, under which (as was said in Grocer Co. v. Adams, 112 La. 75, 36 South. 226) the parties must be presumed to have acted. There is no doubt some conflict between the views expressed in the two cases, but we are of opinion that those which we have cited are correct and must be adhered to. Whatever may be said of the act of 1874, the language of article 3217 of the Code is perfectly plain, and makes it clear that it was not the intention of the law that a person who may have furnished money used in the purchase of a residence in New Orleans or Natchez, should enjoy a privilege therefor, giving him a preference over other creditors on a crop of cotton in Concordia. As to the other proposition, the testimony

adduced on behalf of plaintiff shows, affirmatively and conclusively, that plaintiff did not govern its action by the views expressed in Hewitt v. Williams, but that it entered into its business arrangements with defendant with a distinct understanding of the difference between advances intended to be secured by pledge and those not so intended; the reason of its present trouble being that it waited for advice in order that the act of pledge might be formal and regular, and did not, then, have it so drawn as to cover the amount eventually advanced. Counsel for plaintiff contends that it appears from the record that more than $5,000 of the money furnished was used for necessary plantation supplies, and in this we believe he is correct. But, upon the other hand, plaintiff has been paid $6,000, and has attributed that amount to the satisfaction of the two notes of April 18th and May 31st, respectively. It has therefore been reimbursed the money advanced by it and actually used for the making of the crop, to the extent that the $6,000 mentioned was applied to that purpose, and it can now recover with privilege only so much of the balance of the amount advanced by it as was used in the same way. That the proportion of such balance so used was considerable in amount we entertain no doubt, but the rejection of testimony (and the failure to offer it) renders it impossible for us to reach any satisfactory conclusion as to the figures, and the case will have to be remanded for further inquiry upon that subject.

Counsel for defendant further urges, as a reason why the sequestration should be dissolved, that defendant, having drawn on intervener, through the plaintiff bank, for $2,000, as part of the price which intervener had agreed to pay for the seed, and intervener having paid the draft, by its check, in favor of the plaintiff, the latter must be presumed to have known of the purpose of the draft and check, and must, therefore, be con-

sidered as having acquiesced in the sale of the seed, and as having profited to the extent of the $2,000 thereby, and this view seems to have been taken by the judge a quo. The evidence, however, shows conclusively, as we think, that the draft drawn by defendant was collected by plaintiff for defendant; that the proceeds were placed to the credit of the latter's account; and that the plaintiff paid no more attention to it than it would have paid to any other draft deposited for collection, and drew no inference from the fact that it was drawn on intervener, nor did it profit by the collection, since the proceeds were subject to defendant's control, and were checked out for his own purposes.

Apart from the issues which have thus been considered, and in which intervener makes common cause with defendant, the main contention of the learned counsel for the intervener is, that the seed in question had ceased to be part of the "growing" crop on Dunbarton, had become an article of commerce, and had been delivered to a bona fide purchaser, to whom it had been sold, and into whose hands the privilege of the furnisher of supplies does not follow it. We do not concur in this view. The law does not confine the privilege here asserted to the "growing" crop. On the contrary, the provision relied on reads:

"The debts which are privileged on certain movables are the following: 1. * * * Debts due for necessary supplies * * * and debts due for money actually advanced and used for the purchase of necessary supplies and the payment of necessary expenses for any farm or plantation, on the crops of the year and the proceeds thereof."

Ordinarily speaking, a growing crop is not movable but immovable property, and whilst for the purposes of the law cited, it has been held to be movable, at all times (Weill v. Kent, 52 La. Ann. 2141, 28 South. 295), it has never, so far as we know, been held to be immovable for any purpose, after being severed from the soil, and if it then becomes movable for all other purposes, it would be a singular perversion of ideas that would lead to the conclusion that it would not become so for the purposes of the law by which that status is, in terms, attributed to it, and hence would not be affected by the privilege conferred by the law on movables. To adopt such a theory would be equivalent to holding that the laborer, the overseer, and the furnisher of supplies, who have given their services and money to the cultivation of the crop, lose their privileges by giving the additional service and money necessary to harvest, and prepare the crop for market, a proposition which finds no support in either the reason or the language of the law.

If Dunbarton plantation had been sold with the crop on it, the latter would have passed to the purchaser, subject to the privilege of the furnisher of supplies. Under the law as it formerly stood a privilege was granted to the overseer for his salary "for the year last past, and so much as is due for the current year, on the product of the last year's crop and the crop at present in the ground," which was interpreted by our predecessors in this court as follows:

"This law supposes a continuity of services, and the privilege is not confined to the crop itself of the past year, but extends to the product of it. In relation to the growing crop, the expression is different. The privilege as to the last year's crop may be exercised, it would seem, upon the proceeds, after the crop has been sent to market and sold." Succession of Johnson, 3 Rob. 217.

In a later case it appears that the plantation was sold in 1842, after the overseer had acquired a privilege on the then growing crop, for his salary for the year 1841. He sued the vendor for the salary of 1841, and sequestered the crop of 1842, in the hands of the vendee, who set up that he had purchased without notice. The court said:

"But how can this be a ground for depriving plaintiff of his rights? The law does not require that such privilege be recorded. * * * The plaintiff's privilege existed on the growing crop, at the time of the purchase by Barrow by the

mere effect of the law. Until the sale of the plantation, with the crop then in the ground, the latter belonged to Shields, against whom the right could be exercised. This Barrow must have known, as no one can be presumed to be ignorant of the law. He was aware that a privilege might exist on the growing crop in favor of the overseer for the current and the preceding years, and it was, perhaps, his duty to inquire and to ascertain at the time of the sale whether the crop that he was then purchasing was affected with that kind of a privilege. This he might have easily known from the very person whom he kept in his employment, and who was, perhaps, unaware of the purchase, had no notice to give of the existence of the right, which the law secured, and which he had long before acquired." Welsh v. Shields, 6 Rob. 484.

Applying the doctrine thus stated to the instant case, it may be asked: How can the fact that the intervener agreed with the defendant for the purchase of cotton seed (which was then hanging on the plants) and paid him for it, affect the privilege of the plaintiff for the security of the money which it (plaintiff) was furnishing and continued to furnish for the production and harvesting of that seed? The intervener was bound to know that there was or might be just such a privilege, and others besides on the crop, including the seed, and that it (intervener) would necessarily take the seed cum onere. The plaintiff was under no obligation to give notice, but if it had been so disposed it was not afforded the opportunity, since it was not informed of the transaction between intervener and defendant until about the time that intervener undertook to remove the seed. No one doubts that privileges, whether recorded or unrecorded, against immovables, follow the property, and if the rule is not more frequently applied to privileges on movables, it is rather, as we apprehend, because of the difficulty of tracing property of that character by reason of which the holder of the privilege becomes equitably estopped than because of any difference in the law; and the argument, ab inconvenienti, that such a rule, as applied to crops, would prove a burden to commerce, is met by

the consideration that, if a crop could be sold for future delivery, for a price advanced by the buyer and spent by the seller, and could be delivered on the plantation, remote from a court of justice, in the twinkling of an eye, free of all privileges, it would, perhaps, be found a difficult matter for planters to obtain either labor or means with which to make any crops.

In the instant case intervener, in the month of September, whilst the Dunbarton cotton was in the field, and the money of the plaintiff was being expended on it, agreed with defendant for a future delivery of the seed, and advanced to him a certain amount in consideration of his obligation to make the delivery. No one will pretend that such a transaction was a sale, and no one will deny that the intervener entered into it with full knowledge of the fact that the seed was, probably, if not certainly, subject to privileges for labor and supplies. In January, 1905, when intervener thought proper to send for the seed, or, at all events, before the seed was delivered, the probability that it might be affected with a privilege had become, as we think, to the knowledge of intervener, the certainty, but intervener took the seed, nevertheless, or as much as it could carry away with the means at hand, and it is now said that the privilege which the law gives to the plaintiff as security for the money used in producing the property thus carried away is thereby defeated. If this be true, then the privilege of the overseer and of the laborer may be defeated in the same way, not only as to the seed, but as to the entire cotton crop of a plantation; to the production of which they may have devoted a year of honest toil. The proposition is equally abhorrent to law and justice, and cannot be sustained. The intervener must be held to have taken the seed subject to the obligation with which it was burdened, and must either return it or discharge that obligation.

Counsel for plaintiff in his brief puts the query:

"If the thing in the vendor's hands is subject to a lien or incumbrance, why should he be permitted to give his vendee a title, free from that lien or incumbrance?"

And the only answer that can be given is, "the vendor cannot be so permitted." Privileges on immovables affect "all persons" from the date of their registry. Civ. Code, art. 3274. Privileges on movables require no registry. Const. art. 187. They affect all persons, nevertheless; otherwise they would be of no use to those in whose behalf they are conferred. Privileges, whether recorded or unrecorded, whether bearing on movable or immovable property, become extinct (1) by the extinction of the thing; (2) by the acquisition of the thing by the creditor; (3) by the extinction of the debt; (4) by prescription. Civ. Code, art. 3277. The law does not contemplate that a privilege shall become extinct by the sale of the thing on which it bears. On the contrary, its adhesion to the thing under such circumstances is of its very nature and essence, and unless it so adheres it is no privilege at all.

It is said by counsel for intervener (on the basis of the decision of this court in Minge & Co. v. Barbre, 51 La. Ann. 1285, 26 South. 180), that the amount of advances intended to be secured having been fixed, by the act of pledge, at $7,600, the plaintiff is entitled to no privilege beyond that amount. The case relied on is, however, inapplicable, since, from the face of the act of pledge here presented, it is evident that the parties contemplated other advances, to be otherwise secured, the limit of which is not fixed.

The only point remaining which it seems necessary to notice is that presented in the motion of the plaintiff to amend the judgment, concerning which, for the facilitation of matters in the future, we think it advisable to say that should it eventually appear that plaintiff's privilege, resulting from the actual use, for plantation and crop expenses, of the money advanced by it, requires more property for its satisfaction than has already been realized upon, and should it become necessary to call upon intervener to account for the seed taken or bonded (or both) by it, the intervener should be required to produce the seed itself, or account for it at the market price at the date of the trial hereafter to be held.

For the reasons thus assigned, it is ordered, adjudged, and decreed that in so far as it condemns the defendant in favor of the plaintiff in the sum of $8,540.25, with interest on the different amounts aggregating that sum, and for the costs of the main action, and in so far as it maintains the writ of sequestration and recognizes plaintiff as entitled to the privilege accorded by article 3217 of the Civil Code for the amount which may ultimately be found to be due for money actually advanced and used for the purchase of necessary supplies and the payment of necessary expenses for the defendant's Dunbarton plantation for the year 1904, the judgment appealed from be affirmed, and in all other respects that said judgment be annulled and avoided; and it is further adjudged and decreed that the case be remanded for the purpose of further inquiry, the admission of further testimony, and further adjudication, as to the use made by defendant of the money advanced to him by plaintiff after the exhaustion of the proceeds of defendant's notes for $3,000 each, of April 18, and May 31, 1904, respectively, and for further adjudication as to the rights of the parties upon the basis of the information so to be obtained.

It is further adjudged and decreed that the costs of the appeal be paid by plaintiff, and that the costs in the district court of the intervention await the determination of the question whether, agreeably to the views expressed in the foregoing opinion, any or all, of the cotton seed removed, at the instance of intervener, from Dunbarton plantation, on

the 20th and 21st days of January, 1905, was, at that time, subject to a privilege in favor of the plaintiff.

NICHOLLS, J., absent.

BREAUX, C. J., and LAND, J.   We concur in all the conclusions set forth in the opinion handed down by Justice MONROE in so far as they are applicable to the facts of this particular case, but we are not prepared to assent to the general proposition that the privilege of the furnisher of supplies follows the crop in the hands of third persons.