(44 South. 734.)

No. 16,459.

NATIONAL BANK OF COMMERCE v. SULLIVAN (UNION OIL CO., Intervener).

(June 21, 1907. Rehearing Denied Oct. 8, 1907.)

AGRICULTURE—LIENS ON CROP—EVIDENCE—SUFFICIENCY.

In this case, the court finds that the actual use of money, advanced for the purchase of necessary supplies and the payment of necessary expenses in the making of a crop of cotton, may be arrived at by showing that the money was actually advanced, that the crop was actually made, and that no sufficient amount for the making was obtained from any other source.

(Syllabus by the Court.)

Appeal from Tenth Judicial District Court, Parish of Concordia; John Stirling Boatner, Judge.

Action by the National Bank of Commerce against J. B. Sullivan, in which the Union Oil Company intervened. Judgment for plaintiff, and intervener appeals. Affirmed.

See 41 South. 480, 117 La. 163.

T. M. & J. D. Miller and Samuel Lucius Elam, for appellant. Dagg & Dale and E. E. Brown, for appellee.

## Statement of the Case.

MONROE, J. When this case was before the court on a previous occasion, it was held (quoting syllabus) that:

"The crop privilege, conferred by Civ. Code, art. 3217, in so far as it relates to that subject, is intended to secure the reimbursement only of money which, having been advanced, is actually used, for the purchase of necessary supplies and the payment of necessary expenses for the farm or plantation, and it is for the person seeking to enforce the privilege to prove that the money claimed by him was so used; otherwise, no privilege can be recognized."

It was also held that the privilege asserted by plaintiff, if established by proof of the necessary facts, would bear on certain cotton seed of which intervener had obtained possession; and the case was "remanded, for the purpose of further inquiry, the admission of further testimony, and further adjudication, as to the use made by defendant of the money advanced to him by plaintiff after the exhaustion of the proceeds of defendant's two notes for $3,000 each, of date April 18, and May 31, 1904, respectively." National Bank of Commerce v. Sullivan, 117 La. 163, 41 South. 480.

Intervener now appeals from a judgment recognizing the privilege asserted by plaintiff to the extent of the value of, and condemning it to produce, 544,695 pounds of cotton seed (upon which such privilege is said to bear), or, in default thereof, to pay $3,268.18, with interest; the learned judge a quo saying:

"I am of opinion that the proof shows that the money advanced by the plaintiff, after June 11, 1904 (the day when the notes above stated had been exhausted), used by the defendant in the purchase of necessary supplies and in defraying the necessary expenses in the cultivation and management of Dunbarton plantation,

was, in amount, considerably over and above the value of the cotton seed in the hands of the intervener as shown by the proof in the case; the said advance amounting to about $4,500."

## Opinion.

It is shown by the record (including the transcript brought up on the previous appeal) that, on June 11, 1904, defendant's account with the plaintiff bank was overdrawn by $203.71, from which it follows that the proceeds of the notes referred to in our former decree were, at that time, exhausted. When this case was argued, the present writer entertained serious doubts as to whether plaintiff had succeeded in proving what proportion of the amount subsequently advanced by plaintiff was actually used for the purchase of necessary supplies and the payment of necessary expenses of Dunbarton plantation, in the making of the crop of 1904; but a careful consideration of the evidence adduced, and of the conditions to which it relates, has led to the conclusion that, for all the purposes of this case, the proof is sufficient. The trouble, such as there is, arises from the fact that defendant used his account in the plaintiff bank for other than plantation purposes— depositing to its credit other money than that advanced by plaintiff, and drawing against it for the payment of obligations of all kinds— and that he kept a general store, on his plantation, the stock of which was paid for by checks drawn on that account, and which stock, whilst used in supplying the plantation, was likewise sold to any one who chose to buy it. The money advanced by plaintiff therefore reached the plantation, mainly, through the store, and the fact that it did reach it, or, at least, that an amount was expended for necessary plantation supplies and expenses which exceeded the value of the cotton seed here in question, is arrived at partly by affirmative proof, and partly by deduction.

The plantation in question consists of some 1,500 acres of land, of which about 1,000 acres were planted in cotton, and the rest in corn. The defendant was called as a witness for plaintiff, and intervener's counsel indulges in some criticism on that account; but we are at a loss to know why, as the witness appeared to the trial judge, and appears to us, to have been far from willing, and gave as little information as he well could—in fact, seemed too much disgusted with the whole affair to care to tax his mind or memory for the benefit of either of the litigants.

Being asked:

"Well, take it all around, whether you work it on shares, or wages, or both, how much does it usually cost to make a bale of cotton?"

He answered:

"Sometimes, it would cost $15, $20, $22.50, and, as the gentleman says, it sometimes costs $200."

Being asked:

"What is the average, year in and year out?"

He replied:

"I do not know. You will have to find somebody better posted than I am to answer that question."

Being asked:

"You made 470 bales. Do you think you made, or lost, money?"

His answer was:

"I don't think much about it."

Plaintiff then called two other witnesses, experienced cotton planters, from whose testimony, without going into the details, we are satisfied that the necessary expenses of Dunbarton plantation, from June 11th to the date at which the 472 bales of cotton, constituting the saved crop of 1904, were ready for market, could not have been less than, and in all probability exceeded, $9,000. Turning, then, to defendant's bank account, through which all of his money is shown to have passed, we find, as we have stated, that on June 11th it was overdrawn to the extent of $203.71, and that the overdraft grew larger, until July 8th, when it amounted to $1,433.98. On July

9th, plaintiff discounted defendant's note of $1,600, and placed the proceeds ($1,544.27) to his credit. On July 25th, the account was again overdrawn by $216.59, and the overdraft increased until August 15th, when it amounted to $836.95. On August 16th, plaintiff discounted defendant's note of $1,500, and placed the proceeds ($1,457.34) to the credit of the account. On September 5th, the account was again overdrawn, by $393.74, and the overdraft increased until September 23d, when it amounted to $2,028, and plaintiff then discounted a note of $4,000, and credited the proceeds ($3,902.57) to the account. On November 28th, the account was again overdrawn, by $5.18, and the overdraft increased, by December 8th, to $1,864.50, and, after fluctuating, was finally, on January 16, 1905, reduced, by the sale of cotton seized in this case, to $255.13. It is therefore proved beyond controversy that, under its agreement to make advances for his crop of 1904, plaintiff, between June 11th and, say, December 8th, actually advanced to defendant, in cash, the sum of $8,344.43, and that defendant conducted his planting operations during that period, and made a crop. It further appears that, on September 1st, or about that time (without plaintiff's knowledge), defendant entered into an agreement with H. & C. Newman, of New Orleans, whereby, and in consideration of certain advances to be made, he obliged himself to ship his entire crop (less about 60 bales, shipped J. Weis & Co.) to that firm. It further appears that about that time, or a little later, it became necessary for defendant to pay a pressing debt of $4,837.22, due to the estate of T. K. Green, and that on September 26th or 27th he sold to intervener (without the knowledge of plaintiff), for future delivery, 300 tons of cotton seed, constituting part of the crop in question, for which intervener honored his drafts of September 28th for $1,500, and of October 4th for $2,000, the proceeds of which were deposited, on the date last mentioned, to the credit of his account in the plaintiff bank, and were withdrawn, as follows: On October 4th (the day on which the deposit was made), defendant's account showed a credit balance of $1,677.44, which was increased, by the deposit, to $5,177.44. On October 7th, a check for $125 (issued by defendant in payment, it is said, of some attorneys' fees) was paid, and on October 8th, a check for $4,837.22, issued in payment of the debt due to the estate of Green, was paid, so that the balance to the credit of the account was reduced to $215.22. That being the case, it can readily be seen that, if the checks so paid be charged, proportionately, to the $3,500, obtained from intervener and to the $1,677.44, which was in bank when the $3,500 were deposited, and if the balance, of $215.22, be credited, proportionately, to those two items, constituting the common, or amalgamated, fund, there were only, say, $139.65, of the $3,500, which could, by any possibility, have been available for the purposes of defendant's crop. Without stopping to inquire whether the balance of $215.22 (including the $139.65 referred to) was ever, as a fact, used for that purpose, we next proceed to inquire as to the disposition made of certain advances obtained from H. & C. Newman. The balance of $215.22 was increased, on October 24th, by the deposit of $100, which came from defendant's store, and, on the other hand, was reduced by checks, so that, on November 3d, it amounted to $124.68, and on that date it was increased by the deposit of $3,000, received from H. & C. Newman. But on November 4th defendant drew a check for $3,039.50 in payment of one of the notes, the proceeds of which had been exhausted prior to June 11th, so that the proportion of the $3,000, so received and deposited, which remained available for the purposes of the crop was, say, $82.17; the balance to the credit of the account having been reduced to $85.18. There was, then, a deposit of $139.45, mon-

ey received from the store, and some checks were paid, so that on November 14th the balance to the credit of the account was $26.82, which was increased by a deposit, on that day, of $4,000, received from H. & C. Newman. On the following day, however, defendant drew his check for $3,184.85 in payment of the other of the notes the proceeds of which had been exhausted prior to June 11th, so that the proportion of the $4,000 received from H. & C. Newman which was available for the purposes of the crop was $836.36, to which there was added, on November 21st, the further sum (received from H. & C. Newman) of $2,500, as, also, $50 received from some other source. The account was, nevertheless, as we have already stated, overdrawn to the extent of $5.18 on November 29th, and the overdraft increased to $1,864.50, after which it was reduced, but has never been made good. In the meanwhile the deposits from the store amounted, in all, to $901.05; but, as they were the proceeds of the sale of merchandise purchased with funds advanced by plaintiff, the proportion representing the profit on such sales should, alone, be considered, and, assuming the profit to have been 50 per cent., we have $450.52. There was also deposited $785.02, derived from the sale of cattle. It therefore appears that, after accounting for all other money received by him, defendant received, between June 11 and December 16, 1904, otherwise than from plaintiff, only the following amounts which could have been applied to the making of his crop, to wit:

| | | |
|---|---:|---:|
| From H. & C. Newman | $3,336 | 36 |
| From the store | 450 | 52 |
| From sale of cattle | 785 | 02 |
| Total | $4,571 | 90 |

Upon the other hand, the evidence shows that, during the period mentioned, he cultivated 1,000 acres in cotton and made a crop of which, 472 bales were saved, and, as some witnesses say, 75 bales were left in the field, and, presumably, a lot of corn, of which we have no account, a thing which, as we think, he could not have done with less than $9,000.

We are therefore of the opinion that the conclusion of the judge a quo, that about $4,500 of plaintiff's money was actually used for the purchase of necessary supplies and the payment of necessary expenses in the making of the crop in question, is fully sustained by the proof, and hence that plaintiff is entitled to recognition of its privilege upon that portion of the crop of which the intervener acquired possession.

It is said that there is error in the judgment appealed from, in that it allows $12 a ton for the seed, as in sacks, at Dunbarton; whereas, it should have allowed only for loose seed, at Dunbarton, the value of which, on the day of the trial, was $10.50 per ton. Mr. A. L. George testifies that the price of seed, in sacks, on the Mississippi river, on the day of trial, was $13, equal to $11.50 for loose seed, and that it was worth $1 less at Dunbarton.

From our understanding of the evidence, as to the places and conditions under which the seed was seized by plaintiff, and bonded by intervener, it seems not improbable that it was bonded at Vidalia, and that some of it had been put in sacks by the sheriff. The details, however, are left in obscurity, and there is nothing in the record to justify us in holding that the judge a quo has committed any error in fixing the value of the seed.

The judgment appealed from is, accordingly, affirmed.