No. 3354

Second Circuit

———

BUELOW v. ABELL, SHERIFF, ET AL.

———

(December 19, 1928. Opinion and Decree.)
(January 21, 1929. Rehearing Refused.)

———

Smith & McGregor of Rayville, attorneys for plaintiff, appellant.

Ellis, Ellis & Hunt, of Rayville, attorneys for defendants, appellees.

ODOM, J. A tenant farmer, named R. E. Jordan, cultivated in the year 1927, land belonging to William P. Martin, under the share system, the agreement being that one-fourth of the cotton should go to the land-owner as rent. Jordan gathered the crop of twenty-one bales and carried it to the Delhi Compress Company, of Delhi, Louisiana, and had issued to him a negotiable warehouse receipt for each bale of the cotton. He delivered to Martin, the landowner, seventeen of these warehouse receipts, but retained possession of the other four. He sold the four bales of cotton, for which he had receipts, to E. A. Buelow & Company, cotton buyers, of Vicksburg, Mississippi, through Buelow's agent and buyer, Stout, who lived at or near Delhi where the cotton was grown. In payment of the four bales of cotton, Stout drew a draft on Buelow & Company and attached thereto the four negotiable warehouse receipts. The draft, with receipts attached, was forwarded to Buelow & Company and was paid. The cotton remained in the warehouse at Delhi. The sale by Jordan to Buelow & Company took place on November 22, 1927.

Subsequently, on December 20th, or about thirty days after the cotton had been sold and while it yet remained in the warehouse at Delhi and while the receipts were in the hands of the purchasers, Buelow & Company, Martin, the landowner, filed suit against his tenant, Jordan, alleging that he owned an undivided one-fourth interest in said cotton and that, as a furnisher of necessary supplies, he had a privilege on the other three-fourths interest alleged to belong to Jordan, under Article 3217 of the Civil Code. The cotton was sequestered in the hands of the warehouse company.

On February 13, 1928, judgment was rendered for Martin, the landowner, recognizing him as owner of an undivided one-fourth interest in the cotton and that "his lien and privilege as furnisher of necessary plantation supplies to the extent of $410.97 be recognized on and rendered executory against the remaining three-fourths undivided interest in the above described cotton owned by the said R. E. Jordan."

As stated, this suit was filed and judgment rendered sometime after Buelow & Company had purchased the cotton from Jordan. Buelow & Company were not made parties to these proceedings and knew nothing about them until about March 10, 1928, when the Sheriff was about to sell the cotton at auction to satisfy Martin's judgment.

Buelow & Company, plaintiffs in the present suit, then came into court, asserting ownership of the entire interest in said cotton under their purchase from Jordan free from any lien for plantation supplies, and enjoined the sale of the cotton. Martin answered, reiterating his claim of ownership of one-fourth interest in the cotton and reasserting his privilege on the other three-fourths interest.

The District Court rendered judgment, recognizing Martin as the owner of one-fourth of the cotton, but rejected his de-

mands for a recognition of his privilege. From this judgment both parties appealed.

: :                    OPINION

Our conclusion is that the judgment appealed from is correct, insofar as it rejects Martin's claim to a privilege on the cotton, and that it is erroneous insofar as it recognizes Martin as owner of one-fourth of the cotton.

Counsel for Martin, the landowner, who seeks to reverse the judgment of the lower court on the question of privilege, has filed no brief, but says, "the law, with respect to liens, and especially the kind contended for in the above case, is so well settled in our jurisprudence that attention need not be called to it."

What counsel would have us hold is that as a matter of law the privilege for plantation supplies, under Article 3217 of the Civil Code, follows the crop under any and all conditions, and he contends that the jurisprudence is settled that it does. We think counsel is in error.

It is true that in the case of National Bank of Commerce vs. Sullivan (Union Oil Company, Intervenor), 117 La. 163, 41 So. 480, the Court held that such privilege is not confined to the growing crop, "but bears upon the products after they are severed from the soil and follows them into the hands of a purchaser who, buying directly from the planter, is presumed to know that such privilege may or actually does exist." But that holding, as an unqualified proposition of law, was seriously questioned, if not altogether repudiated, in a later case, that of Union Seed & Fertilizer Company vs. J. Supple's Sons Planting Company et al., 139 La. 692, 71 So. 949, where the organ of the Court, referring to the Sullivan case, supra, said:

"In fact, the decision cannot even be considered authority for the general proposition that the privilege of the furnisher of supplies follows the crop in the hands of third persons without registry of the claim; because, to that extent, the then Chief Justice and one of the Associate Justices dissented from the opinion, and another of the Justices was absent, and did not take part in the decision."

The Court at that time was composed of five justices, only four of whom took part, and, while all of the justices taking part in that case concurred in the decree under the facts there disclosed, yet two of them stated:

"We are not prepared to assent to the general proposition that the privilege of the furnisher of supplies follows the crop into the hands of third persons."

Therefore, the principle there announced was concurred in by only two justices, not a majority of the court. We do not understand that the holding in the Sullivan case under the facts found by the court has been questioned; on the contrary, it has been affirmed. The criticism is that the rule was too broadly stated by the organ of the Court.

The facts in the Sullivan case were that in the month of September, while the cotton was still in the field and while the money advanced to the farmer to make the crop was being expended for that purpose, a third person bargained with the planter for a future delivery of the seed and advanced to him a certain sum in consideration of his obligation to make the delivery. The Court said:

"No one will pretend that such a transaction was a sale, and, no one will deny that the intervenor entered into it with full knowledge of the fact that the seed was probably, if not certainly, subject to privileges for labor and supplies."

And the Court in commenting said that when the probability that there were privileges on the crop had become a certainty, insofar as the intervenor was concerned, it carried away from the plantation all the seed it could. The Court held that, under the circumstances, the seed in the hands of the intervenor were burdened with the furnisher's privilege. But the intervenor was not an innocent purchaser; in fact, the Court said the transaction between the planter and the intervenor did not amount to a sale.

In a later case, that of Brooklyn Cooperage Company vs. Cora Planting Company, 137 La. 807, 69 So. 195, a broker bought sugar on the plantation where it was produced, and, while the sugar had been delivered by the planter, it had not been removed. The Court held that the sugar was subject to the furnisher's lien. In that case, the Judge of the lower court held, it seems, that there had been no actual delivery of the sugar, and, Justice Land, the organ of the Court, said:

"There was no change in the physical possession of the sugar, and, if there was any delivery, it was merely constructive. A sale of movables without actual delivery does not affect third persons, and the property is liable in the hands of the vendor to seizure and attachment in behalf of his creditors." (Citing Articles 1922 and 1923, Civil Code.)

But the Court went on:

"Even conceding that the sugar was delivered on the plantation, but not removed therefrom, it was still subject to the privileges on the crops of the year." (Sullivan case, supra.)

The Sullivan case and the Cooperage Company case are alike in that in each instance the sale was made on the plantation where the crop was grown and before it was removed therefrom. Under such circumstances, the purchser is charged with knowledge that the crop is, or may be, burdened with privileges. But in no case, insofar as we can find, has it been held that the privilege follows the crop after it has been harvested, made ready for sale, removed from the plantation, carried to a public market, and there sold and physically delivered to an innocent purchaser.

On the contrary, it has been held that such privileges are lost when not asserted in time to prevent the products on which they rest from entering the channels of trade, the theory being that when such products are sold in open market and enter into commerce, they are no longer "crops," but merchandise. (See Loeb vs. Collier, 131 La. 377, 59 So. 816; also Brooklyn Cooperage Company vs. Cora Planting Company, supra.)

Those are the very conditions we find in the case at bar. Jordan, the planter, picked the cotton, had it ginned and baled, carried it to Delhi, and there stored it in a public warehouse. For each bale of cotton, the warehouse issued and delivered to him a negotiable warehouse receipt which recited on its face, "upon the return of this receipt and the payment of all charges and liabilities due the undersigned, as stated herein, this bale of cotton will be delivered to bearer, unless destroyed or damaged as herein provided."

Jordan took these receipts to a merchant named Gunter, and left them with him. He went to Stout, Buelow & Company's buyer, and offered to sell the cotton. Stout got the numbers of the bales from the receipts, went to the warehouse, took samples of the cotton and bought it. In payment for the cotton, he drew a draft on Buelow & Company, who have their office in Vicksburg, Mississippi, and at-

tached the receipts to the draft. The draft, with receipts attached, was sent to Buelow & Company and was paid.

When these bales of cotton were removed from the plantation, put in a public warehouse and negotiable warehouse receipts of the kind described issued therefor, and, when the cotton was sold by Jordan, the owner, to Buelow & Company by assignment and delivery of the receipts, the cotton ceased to be a "crop," but was merchandise, in the channels of trade, in commerce, and the privilege was lost.

Martin, who now asserts a privilege on the cotton, knew that Jordan was removing the cotton from the plantation and was placing it in the warehouse, and that there was being issued to him a negotiable warehouse receipt for every bale of it. These receipts, under the law, were muniments or documents of title. Title to and delivery of the bales were completed by the assignment and delivery of the receipts for value. There is no intimation or suggestion that Buelow & Company, through their agent and buyer, Stout, had any reason to suspect, much less knowledge, that Martin, or anyone else, claimed any privilege on the cotton.

Jordan had been a tenant on Martin's plantation for six or seven years, and had always handled his cotton in the same way, to the knowledge of both Stout, the buyer, and Martin, the landowner. As to Buelow & Company, Martin's lien was a "secret lien."

In the case of Loeb vs. Collier, supra, the Court said:

"Privileges are in derogation of common rights, and secret liens hamper commerce, hence, privileges are strictly construed and secret liens are not favored."

It is true that in that case the purchaser of the cotton had sold it to another. But the holding of the Court was based upon the proposition that when the furnisher of supplies stands by, without asserting his lien, and allows the product to enter the channels of trade, he loses his lien, for, said the Court, "if this were not true, it would be unsafe for anyone at any time to buy from anybody a bale of cotton, a sack of rice or a pound of sugar."

Martin's other point is that, as landowner, he owns an undivided one-fourth interest in each bale of cotton sold by Jordan to Buelow & Company, Jordan being his tenant under the share system. Our conclusion is, and we hold, that whatever interest he owned in said cotton was divested by the sale which Jordan made to Buelow & Company.

In the case of Commercial National Bank of New Orleans vs. Canal-Louisiana Bank & Trust Co., 239 U. S. 520, 36 S. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917E, 25, Supreme Court Reporter, Vol. 36, 194, the Court, through its organ, Justice Hughes, said:

"It is a familiar rule that one who has no title to chattels cannot transfer title unless he has the owner's authority or the owner is estopped. See Civil Code (La.) Arts. 2452, 3142, 3145, 3146. It follows that, in the absence of circumstances creating an estoppel, one without title cannot transfer it by the simple device of warehousing the goods and indorsing the receipts. But if the owner of the goods has permitted another to be clothed with the apparent ownership through the possession of warehouse receipts, negotiable in form, there is abundant ground for protecting a bona fide purchaser for value to whom the receipts have been negotiated. Pollard vs. Reardon, 13 C. C. A. 171, 21 U. S. App. 639, 65 Fed. 848, 852; Williston, Sales, 421. The effect of the negotiation of warehouse receipts is defined in the uniform warehouse receipts act, enacted in Louisiana by Act 221 of 1908. This Act provides:

"'Sec. 40. Who may negotiate a receipt, —A negotiable receipt may be negotiated,

" '(a) By the owner thereof; or

" '(b) By any person to whom the possession or custody of the receipt has been intrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been intrusted, or if at the time of such intrusting the receipt is in such form that it may be negotiated by delivery.

" 'Sec. 41. Rights of person to whom a receipt has been negotiated,—A person to whom a negotiable receipt has been duly negotiated acquires thereby—

" '(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value; and

" '(b) The direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him.

\*     \*     \*     \*     \*     \*

" 'Sec. 47. When negotiation not impaired by fraud, mistake or duress,—The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part by the fact that the owner of the receipt of the person making the negotiation, or was induced by fraud, mistake or duress to intrust the possession or custody of the recipt to such person, if the person to whom the recipt was negotiated, or a person to whom the receipt was subsequently negotiated, paid value therefor, without notice of the breach of duty, or fraud, mistake or duress.'

"It will be observed that 'one who takes by trespass or a finder is not included within the description of those who may negotiate.' (Report of Commissioners on Uniform State Laws, January 1, 1910, p. 204.) Aside from this, the intention is plain to facilitate the use of warehouse receipts as documents of title. Under Sec. 40, the person who may negotiate the receipt is either the 'owner thereof,' or a 'person to whom the possession or custody of the receipt has been intrusted by the owner' if the receipt is in the form described. The warehouse receipt represents the goods, but the intrusting of the receipt, as stated, is more than the mere delivery of the goods; it is a representation that the one to whom the possession of the receipt has been so intrusted has the title to the goods."

Jordan had lived on Martin's place, as a tenant, for six or seven years. During all these years, he had handled all the cotton he produced just as he handled the crop of 1927—that is, by depositing it in the public warehouse and taking receipts therefor. In 1927, and in other years, the receipts were made out in the name of and delivered to Jordan. He usually, but not always, delivered them to Martin and they settled later. But Martin always intrusted the handling of the cotton to Jordan and permitted the warehouse receipts to be issued in his name and delivered to him, and this to the knowledge of the trade. These receipts, to the knowledge of Martin, provided on their face that the cotton would be delivered to the bearer thereof. As stated by Justice Hughes, "the intrusting of the receipts \* \* \* is more than a mere delivery of the goods, it is a representation that the one to whom the possession of the receipt has been intrusted, has the title to the goods."

Martin, having voluntarily intrusted Jordan with, not only the possession and handling of the cotton, but the receipts as well, it follows that Buelow & Company, who purchased the cotton under an assignment and delivery of the receipts, are protected in their title under the provisions of the statute. (Act 221 of 1908.)

Counsel for Buelow & Company ask for attorney's fees in the sum of $100.00, for obtaining the injunction restraining the Sheriff and Martin from proceeding further

with the sale of the cotton in controversy. The judgment of the lower court makes no mention of this claim and we, therefore, assume that this item was rejected. We think, under the circumstances of this case and the following authorities, that the amount claimed and proved should be allowed:

White vs. Givens, 29 La. Ann. 571; Gilkerson-Sloss Co. vs. Yale & Bowling, 47 La. Ann. 695, 17 So. 246; Ludeling vs. Garrett, Sheriff, 50 La. Ann. 120, 23 So. 94; Soniat vs. Whitmer, 141 La. 240, 74 So. 916.

As a general rule, attorney's fees are not allowed in cases of this kind, but there are exceptions, as noted in the above decisions, and we think this case falls within these exceptions.

Martin, the defendant in this case, knew that Jordan had sold the cotton in dispute to Buelow & Company long before he asserted any claim or privilege thereon. He testified that when Jordan delivered to him the warehouse receipts for two of the last six bales of cotton, Jordan told him that he had sold the other four bales. Thirty days later, Martin brought suit against Jordan to have his claim recognized, but did not make Buelow & Company a party thereto.

For the reasons assigned, it is therefore ordered, adjudged and decreed that the judgment appealed from be affirmed, insofar as it rejects Martin's claim to a privilege on the cotton; and that it be and is hereby reversed insofar as it recognized Martin as the owner of an undivided one-fourth interest in said cotton; and it is now ordered and decreed that the injunction sued out be maintained and perpetuated, and that Buelow & Company be decreed the owners of the entire interest in said cotton; and it is further ordered and decreed that the defendant, Martin, pay all costs of this suit, including $100.00 attorney's fees.